*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 13a0329p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

―――――――――――

RONALD MICHAEL CAUTHERN,
　　　　　　*Petitioner-Appellant*,

　　v.

ROLAND COLSON, Warden,
　　　　　　*Respondent-Appellee*.

No. 10-5759

Appeal from the United States District Court
for the Middle District of Tennessee at Nashville.
No. 3:04-cv-1100—Aleta Arthur Trauger, District Judge.

Argued: April 30, 2013

Decided and Filed: November 14, 2013

Before: COLE, CLAY, and ROGERS, Circuit Judges.

―――――――――――

## COUNSEL

**ARGUED:** Laurence E. Komp, Manchester, Missouri, for Appellant. Andrew Hamilton Smith, OFFICE OF THE TENNESSEE ATTORNEY GENERAL, Nashville, Tennessee, for Appellee. **ON BRIEF:** Laurence E. Komp, Manchester, Missouri, Paul J. Bruno, Nashville, Tennessee, for Appellant. Andrew Hamilton Smith, OFFICE OF THE TENNESSEE ATTORNEY GENERAL, Nashville, Tennessee, for Appellee. Michael J. Benza, CASE WESTERN RESERVE UNIVERSITY SCHOOL OF LAW, Cleveland, Ohio, for Amicus Curiae.

　　　CLAY, J., delivered the opinion of the court, in which COLE, J., joined., and ROGERS, J., joined in part. ROGERS, J. (pp. 34–38), delivered a separate opinion dissenting from Parts III. B. and VI. B. 1. of the majority's opinion.

---

**OPINION**

---

CLAY, Circuit Judge.  Petitioner, a convicted murderer and rapist sentenced to death in Tennessee, sought a writ of habeas corpus pursuant to 28 U.S.C. § 2254(d).  The district court denied his petition in its entirety, but granted Petitioner a certificate of appealability on one claim—that the state improperly excluded mitigation evidence at his resentencing hearing.  This Court expanded the certificate to cover four additional claims.  Petitioner now appeals on those issues, which are the prosecutor's misconduct in rebuttal at Petitioner's resentencing; ineffective assistance of counsel at his resentencing; suppression of favorable, material evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963); improper review of the exclusion of mitigation evidence at the resentencing; and unconstitutional vagueness in the Tennessee aggravating factor applied at resentencing.

For the reasons set forth in this opinion, we **AFFIRM** the district court with respect to all of Petitioner's claims except for his claims of prosecutorial misconduct and ineffective assistance of counsel, **REVERSE** the district court with respect to those two claims and **GRANT** a conditional writ of habeas corpus.

**BACKGROUND**

**I.      Factual Background[1]**

Captain Patrick Smith and his wife, Captain Rosemary Smith ("Patrick" and "Rosemary") were officers in the United States Army Nurse Corps, stationed at Fort Campbell, Kentucky and living at 352 Hampshire Drive in Clarksville, Tennessee.  On January 9, 1987, when neither Patrick nor Rosemary reported for duty, Major Kathleen Campbell and a sergeant drove to the Smiths' home, and arrived there at about 11:00

---

[1]Because the facts underlying each of Petitioner's claims are unrelated, or from different procedural phases of the case, some facts are discussed in the section on procedural history or in the section that addresses the particular claim to which they are relevant.

a.m. They noticed that both of the Smiths' cars were in the garage, and the glass on the backdoor had been broken from the outside. Major Campbell went to a neighbor's house and phoned the police.

When the police arrived, they found evidence of forcible entry, and the house ransacked. They also found the Smiths dead in separate bedrooms, each apparently killed by strangulation. Officer John Nichols of the Clarksville Police Department ("CPD") was one of the officers on the scene. Ronnie M. Cauthern ("Petitioner"), and Brett Patterson ("Patterson") were ultimately arrested for the murders, along with Eric Barbee ("Barbee"), who was a friend of Patterson's, though Barbee was never implicated in the murders. Patterson and Cauthern were convicted of the murders, as well as other crimes related to the incident. The Tennessee Court of Criminal Appeals entered the following findings of fact:[2]

> [T]he body of Patrick Smith lying face down on the bed in the master bedroom, facing 90 degrees counter clockwise from his sleeping position, and wrapped in the top sheet. He had been strangled to death, apparently with a length of 880 military cord. The bed was broken and tilted indicating a violent struggle had taken place.

*Cauthern v. State*, 145 S.W.3d 571, 580 (Tenn. Crim. App. 2004) (quoting *State v. Cauthern*, 778 S.W.2d 39, 40 (Tenn. 1989)).

> The body of Rosemary Smith was discovered in another bedroom; her underclothes were next to her body and her nightgown was in the corner of the room. A scarf had been tied around her neck and knotted, with a small vase inserted between the nape of the neck and the knot, creating a tourniquet . . . Credit cards, electronic gear and a videocassette recorder appeared to be missing from the house. Police found costume jewelry in the house, but no jewelry of value.

*Id.* (quoting *State v. Cauthern*, 967 S.W.2d 726, 730 (Tenn. 1998)).

---

[2]Under 28 U.S.C. § 2254(e)(1), "a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." Petitioner has not presented evidence that demonstrates any dispute over the facts of the underlying incident, and accordingly, these facts are presumed correct. *Thompson v. Bell*, 580 F.3d 423, 434 (6th Cir. 2009). As is discussed more fully in the section on procedural history, there are two relevant state court decisions: the Tennessee Supreme Court's decision in 1998, denying Petitioner's direct appeal of his resentencing hearing, and the Tennessee Court of Criminal Appeal's decision in 2004, which denied Petitioner's collateral challenges.

The police found the telephone line had been cut near its entry into the outside wall of the house. A shoe print was found on the back door that matched Patterson's shoe. In a statement that he gave police he admitted kicking the back door once or twice, but said it would not open so they obtained a hammer and broke the pane of glass nearest the door knob to gain entry. The house was ransacked, chest of drawers open, luggage and clothing scattered about. In the master bedroom, the police found a piece of paper upon which was written defendant Cauthern's name, address and telephone number. Rosemary Smith's sister testified she was familiar with both her sister's and her brother-in-law's handwriting and the information about Cauthern was not written by either of them. The cumulative evidence [established] that defendant and the Smiths had been acquainted for approximately a year at the time of the murders, that he had performed some work on Patrick's Mercedes and perhaps some additional work at their home, although he said in one of his statements that he had never been inside their home until the evening of 8 January 1987.

*Id.* (quoting *Cauthern*, 778 S.W.2d at 40.)

James Phillip Andrew testified [at both trials] that he was with the defendant, Ronnie Cauthern, and Brett Patterson shortly after the offenses. While watching television, they all saw an account of the Smiths' murders in which a reward was offered for information. Cauthern told Andrew that he had worked for the Smiths in the past and that he broke into their home and made the woman get into the closet, while he and Patterson strangled the man. Cauthern told Andrew that he raped the woman once and that he had stolen a wedding ring, a VCR, and some credit cards . . . .

Joe Denning, Andrew's roommate, also testified that Ronnie Cauthern admitted his role in the killings. Cauthern told Denning that he had cut the telephone lines to the house, had broken in through the back door, had shined flashlights in the victims' faces in order to wake them, and had placed Rosemary Smith in a closet. He admitted to Denning that he had raped the woman and poured wine coolers over her, and then attempted to kill her. He said he tried to strangle the woman by tying a scarf around her neck, but did not have the strength to kill her, so he used the vase to create a tourniquet....

Cauthern's former girlfriend, Jackie Pigue, testified that on Thursday night, January 8, 1987, Cauthern and Patterson were "solemn" and "quiet." The next day Cauthern gave her a watch and a wedding ring. He told her that someone owed him money and he was holding the items

as collateral.  When she later saw a news report regarding the murders and Cauthern's arrest, she went to the police and gave them the jewelry.

Cauthern and Patterson were arrested on January 12, 1987.  Search warrants were obtained for Cauthern's car and Patterson's house. Among the items found were the victims' credit cards, identification cards, receipts, checks and two key rings containing keys which unlocked the Smiths' home and automobiles.  The police also found two ski masks, several handguns, a roll of 880 military cord, and Patrick Smith's jacket.

Initially, Cauthern gave several statements to the police, all of which were admitted into evidence at the sentencing hearing.  In the first statement, he denied knowing the Smiths or anything about the murders. In a later statement, which was recorded and transcribed, Cauthern admitted that he was in the Smiths' home, but denied that he had raped or murdered anyone.  Claiming that he and Mrs. Smith were having an affair, he contended that she had called and invited him to come to the Smith house and enter through the back door.  He said that both he and Patterson had consensual sex with Mrs. Smith, and he denied that he participated in the murders, raped the victim, or removed any items from the house.

[At the 1995 resentencing trial], Cauthern testified that he was nineteen years old at the time of the murders.  He stated that he never knew his birth father and saw his birth mother approximately three times during his entire life.  His birth mother died, and he was adopted by his maternal grandmother and step-grandfather who moved to Clarksville in 1973. The defendant attended Northeast High School, but dropped out to care for his grandmother who had Parkinson's disease, so that his step-grandfather could continue to work.  He was married at the age of eighteen and at the time of the hearing, had an eight-year-old son. Although he had divorced his son's mother, he continued to see his son every three to five months.  Since his incarceration he had remarried. His wife, who lived in Canada, was not at the hearing.  He testified that he helps his parents by writing letters for them.

Cauthern also said he had completed the Graduate Equivalency Examination and a paralegal course since being incarcerated, and he serves as a teacher's aide to the unit prison teacher.  He has achieved "A" status at Riverbend Maximum Security Institution for privilege purposes, which is the highest status available for a prisoner.  He introduced letters of appreciation from a correctional officer and the prison teacher.  A Unit Review Panel Hearing form containing positive comments concerning his behavior and attitude was also introduced.  He makes extra money by drawing greeting cards and selling them to other prisoners.  Charles Tracy, a teacher for the Department of Correction, testified that he chose

Cauthern as a teacher's aide because he gets along well with others and has good communication skills.

*Id.* (quoting *State v. Cauthern*, 967 S.W.2d at 730–31).

## II.     Procedural History

Petitioner was indicted on February 3, 1987. The indictment had eight charges: first-degree felony murder for the death of Patrick, first-degree felony murder for the death of Rosemary, first-degree burglary, aggravated rape, rape, third-degree burglary, grand larceny, and armed robbery.[3] Petitioner was tried by jury with Patterson in February 1988. On February 23, 1988, after about four hours of deliberations, the jury returned guilty verdicts on the murder, burglary, and aggravated rape charges.

The penalty phase of the trial began that day and ended on February 25, 1988. The jury returned a sentence of death for Petitioner on both of the murder counts, and sentences of life imprisonment for Patterson on the murder charges. On March 18, 1988, Petitioner was formally sentenced to death for the two counts of felony murder, as well as forty years' imprisonment on the aggravated rape count, and ten years' imprisonment for the first-degree burglary. Petitioner filed his notice of appeal on May 20, 1988. The Tennessee Supreme Court[4] affirmed the felony murder convictions but remanded the sentences of death because the trial court failed to suppress portions of Petitioner's third statement to the police. The United States Supreme Court denied the petition for a writ of certiorari. *Tennessee v. Cauthern*, 495 U.S. 904 (1990).

Venue for the resentencing was transferred to Gibson County, Tennessee (from Montgomery County) because of concerns over publicity in the original venue. At Petitioner's 1995 resentencing hearing, the jury heard testimony from Patrick's mother, Constance Smith, about Patrick and Rosemary's background and aspirations. The jury

---

[3]The counts of third-degree burglary, grand larceny, and armed robbery were unrelated to the Smith murders and were not tried in the same trial.

[4]Because this was a capital case, Petitioner had the right of direct review by the Tennessee Supreme Court, and therefore by-passed review by the Tennessee Court of Criminal Appeals. *Cauthern v. State*, 145 S.W.3d at 579 n.1.

also heard testimony from Officer Nichols, about the crime scene, and from a doctor
about the injuries sustained by the victims. Detective Cockarell testified that there had
been a violent struggle. Other detectives testified as to statements given by Petitioner.[5]
The final state witness was Andrew, who repeated his earlier testimony regarding
Petitioner boasting of the rape. The defense called Charles Tracy, a teacher who worked
with the Tennessee Department of Correction, who knew Petitioner because Petitioner
worked as a teacher's aide for him, and Petitioner himself testified. During rebuttal, the
prosecutor gave an inflammatory speech, reproduced in the relevant section below,
which Petitioner contends gives rise to a claim for habeas relief.

At the conclusion of the resentencing hearing, Petitioner was sentenced to life
in prison for the murder of Patrick, and to death for the murder of Rosemary. That
sentence was affirmed by the Tennessee Court of Criminal Appeals on December 2,
1996, and by the Tennessee Supreme Court on March 23, 1998. *State v. Cauthern*, 967
S.W.2d 726 (Tenn. 1998). Certiorari to the United States Supreme Court was again
denied on November 2, 1998. *Cauthern v. State*, 525 U.S. 967 (1998). Petitioner filed
a *pro se* petition for post-conviction relief in January 1999. He later amended that
pleading with the assistance of counsel. That petition was denied after evidentiary
hearings. The Tennessee Court of Criminal Appeals affirmed the lower court's
judgment in February 2004, and the Tennessee Supreme Court declined to hear
Petitioner's appeal in August 2004. During the post-conviction hearings:

> [T]he petitioner presented testimony from twelve witnesses. Three
> family members, two family friends, and the petitioner's former wife
> testified about the petitioner's upbringing and social history. The two
> attorneys who had previously represented the petitioner recounted their
> investigative efforts, pretrial preparation, and trial strategy on the
> petitioner's behalf. Two former law enforcement officers testified to
> Brett Patterson's prior criminal history and his suspected involvement in
> the rape and strangulation death of a teenage female in Los Alamos, New
> Mexico. An expert in clinical and forensic psychiatry testified about his
> evaluation of the petitioner and the resulting diagnosis. Last, the Deputy
> Consul General to the German Consulate in Atlanta, Georgia testified as

---

[5]Some of the testimony at the sentencing was relevant only to claims that Petitioner no longer
pursues, and has been omitted.

an expert on the subjects of German citizenship, the petitioner's genealogy that could qualify him for German citizenship, and the requirements of the Vienna Convention when a German national is arrested in the United States. In rebuttal to the petitioner's experts, the state presented testimony from a psychologist who had been retained by the prosecution to perform a forensic evaluation of the petitioner and from a senior counsel with a Washington, D.C. law firm whose practice focused on public and private international law. The petitioner did not testify in support of his bid for post-conviction relief.

*Cauthern v. State*, 145 S.W.3d 571, 582–83 (Tenn. Crim. App. 2004).

Petitioner, having been granted counsel, filed the instant petition on June 3, 2005, raising 27 claims for relief. The district court denied the petition in its entirety, on March 31, 2010, and declined to issue a certificate of appealability with respect to any of the claims. On May 28, 2010, the district court declined to amend its judgment, but did issue a certificate of appealability as to the question of "whether the Tennessee Supreme Court's application of a harmless error test to the improper exclusion of mitigating evidence at the 1995 resentencing was contrary to, or involved an unreasonable application of, clearly established federal law." (R. 180, Memorandum Opinion, May 28, 2010, at 1.) (Claim 2 in the petition)

Upon Cauthern's motion, this Court granted an expanded certificate of appealability on August 16, 2011. That certificate added the following issues to review: (a) "whether the prosecutor engaged in misconduct during closing argument at the resentencing hearing" (Claim 1); (b) "whether the State withheld favorable evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963), and its progeny" (Claim 4); (c) "whether trial counsel rendered Cauthern ineffective assistance at his 1995 resentencing hearing" (Claim 5) and (d) whether the heinous, atrocious, or cruel aggravator weighed by the jury was unconstitutional. (Claim 7).

## DISCUSSION

### I.    Standard of Review

Where a district court has denied a habeas petition, and issued a certificate of appealability, "we review the district court's legal conclusions *de novo* and its factual findings for clear error." *Hanna v. Ishee*, 694 F.3d 596, 605 (6th Cir. 2012) (citing *Smith v. Mitchell*, 567 F.3d 246, 255 (6th Cir. 2009)).  The district court's findings of fact are clearly erroneous when "we are left with the definite and firm conviction that a mistake has been committed." *United States v. Canipe*, 569 F.3d 597, 600 (6th Cir. 2009) (citing *United States v. Ellis*, 497 F.3d 606, 611 (6th Cir. 2007)).

### II.    AEDPA[6]

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a federal court may not grant a writ of habeas corpus with respect to any claim adjudicated on the merits in state court unless the state adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

28 U.S.C. § 2254(d).  A federal court may not issue the writ "simply because it concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable." *Williams v. Taylor*, 529 U.S. 362, 411 (2000).  "[C]learly established federal law, as determined by the Supreme Court of the United States" refers to the holdings, rather than dicta, of the decisions of the Supreme Court. *Howes v. Fields*, ___ U.S. ___, 132 S. Ct 1181, 1187 (2012) (quoting *Williams*, 529 U.S. at 362).

---

[6]The petition was filed on June 3, 2005, which is after the effective date of AEDPA, and accordingly, AEDPA standards govern the petition. *See Lindh v. Murphy*, 521 U.S. 320, 326–27 (1997).

A decision that is "contrary to" clearly established federal law occurs where "the state court arrives at a conclusion opposite to that reached by this Court on a question of law . . . [or] confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at [the opposite] result." *Williams*, 529 U.S. at 405. Furthermore, an unreasonable application must be distinguished from an incorrect application. *Harrington v. Richter*, 562 U.S. ___, 131 S. Ct. 770, 785 (2011) (quoting *Williams*, 529 U.S. at 410). A state court decision which is merely incorrect, rather than unreasonable, is still entitled to deference by a federal court in a habeas proceeding. *Id.* As a result, the more general the rule, the greater the leeway accorded to a state court's decision under federal habeas review. *Id.* at 786.

Under AEDPA this Court reviews the last reasoned state court decision. *See Cullen v. Pinholster*, 563 U.S. ___, 131 S. Ct. 1388, 1402 (2011) ("Section 2254(d) applies even where there has been a summary denial."). Even when a state court does not provide significant analysis, this Court must show significant respect to state court decisions:

> Even in the case of a summary denial, when the state court has not fully explained the rationale for its decision, the reviewing "habeas court must determine what arguments or theories could have supported the state court's decision; and then it must ask whether it is possible [that] fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior [Supreme Court] decision."

*Gagne v. Booker*, 680 F.3d 493, 514 (6th Cir. 2012) (en banc) (quoting *Pinholster*, 131 S.Ct. at 1402).[7]

---

[7]In this case, the question of what constitutes the last reasoned state court decision is slightly more complicated than in an ordinary habeas proceeding. Petitioner seeks federal habeas review of some claims that were presented to the Tennessee Court of Criminal Appeals during his collateral challenge to his conviction and sentence, as well as to claims that were only raised during his direct appeals. Neither party claims that Petitioner failed to exhaust any of his claims, and so the last reasoned state court decision may be different with respect to certain claims, depending on the availability of state collateral relief.

### III.     Prosecutorial Misconduct

### A.     The Prosecutor's Misconduct at the Resentencing Hearing

During closing arguments at the 1995 resentencing hearing Assistant Attorney General Steve Garrett gave a rebuttal that included the following language:

> Yes, we are asking for the death penalty. Why? Why should Ronnie Cauthern die? I once heard an interpretation of the Lord's Prayer. "Deliver us from evil," originally translated and actually read. "Deliver us from the evil one"—far more personally, far more graphic, and far more intense—the evil one.
>
> In the 1960's, the Rolling Stones came out with a song. The refrain after each chorus was, "Pleased to meet you. Hope you guess my name." And, I suggest to you it was a song about the evil one appearing in person throughout the ages in many different guises. Mr. Poland says civilized society—in a civilized society, we don't kill. But in civilized society, we must address— we must stand up to, we must confront the realities of our daily existence and our daily survival not only of ourselves but of our children and their children. It came to dawn on me after I thought about, "Please to meet you, hope you guess my name"—that on January the 9th, 1987, the evil one descended upon Patrick and Rosemary Smith, and the evil one is smart, the evil one is skilled, the evil one is wily, and the evil one is manipulative. A simple little demonstration of that, ladies and gentleman, is this. The evil one appeared today and produced greeting cards—"Merry Christmas," "Happy Holidays." But on January the 8th, 1987, the evil one appeared at the door of 351 Hampshire Drive, a home not unlike yours in a neighborhood not unlike yours—the evil one appeared there in disguise—a mask, a black jacket, a pistol, strangling rope, and the evil one is capable of taking advantage of what was available inside their house. Yes, whether you like it or not—whether you volunteered or not, you are engaged in the ultimate battle in everyday combat with the evil one, and he's not going to go away. He appeared in Minnesota in the form of Jeffrey Dahmer. He appeared in Union, South Carolina, and on January the 9th, he appeared at the door of Patrick and Rosemary Smith. You cannot negotiate with the evil one, ladies and gentlemen. You cannot deal in good faith with the evil one. You have got to destroy and destroy, or he and his benefactors will destroy you. He'll destroy us. He'll destroy our children. The evil one took the name of Ronnie Cauthern on that day. That was his name, and he's beyond redemption. He's beyond redemption. There is no treatment for this individual posing in a mask and taking human form. There is no treatment for this person. This person has been around through all ages

and will appear again. You cannot cure him. Don't try to save him. Engage him in combat and destroy him. Do your duty. When you open that paper and you find that the State has carried out your instruction, you will have scaled the ramparts at least one time, and you will have been a part of bringing back peace and tranquility in your community and in our community, and you will send a message to the evil one. You will send a message that we stand ready—armed, and ready to fight for all in the world, for everything that you believe in, for the sanctity of your home, the blessing of seeing your children reach adulthood and have your grandchildren, and you will take a step and leave a legacy to your children that they someday will not have to grapple with what the Smiths had to deal with and what Karen Rivetna and her mother have to deal with.

"Holiday Greetings"—a time for loved ones to get together. Horrible chaos has been reaped and racked on this family. I'm asking you to do your duty. Stand tall. Thank you.

(R. 27, Return Addendum 5, Vol. 4, State Rebuttal at Resentencing, at 463–65, Dec. 7, 2005.) Petitioner claims that this rebuttal amounted to prosecutorial misconduct, and seeks habeas relief on that basis.

## B.     Analysis

In reviewing a claim for habeas relief based on prosecutorial misconduct in a closing argument, "[t]he relevant question is whether the prosecutors' comments so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo,* 416 U.S. 637, 643 (1974) (internal quotation marks omitted)). "Moreover, the appropriate standard of review for such a claim on writ of habeas corpus is 'the narrow one of due process, and not the broad exercise of supervisory power.'" *Id.* (quoting *Donnelly*, 416 U.S. at 642) (analyzing a habeas claim prior to the enactment of AEDPA). "Past decisions of [the Supreme Court] demonstrate that the touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips*, 455 U.S. 209, 219 (1982). "[T]he cardinal rule [is] that a prosecutor cannot make statements 'calculated to incite

the passions and prejudices of the jurors.'" *Gall v. Parker*, 231 F.3d 265, 315 (6th Cir. 2000) (quoting *United States v. Solivan*, 937 F.2d 1146, 1151 (6th Cir. 1991)).

The Tennessee Supreme Court found that the remarks did not unfairly prejudice Petitioner. They found that "while . . . the prosecution's argument was patently improper and caution prosecutors against similar argument in the future, we nevertheless hold that in this case, the argument did not affect the sentence or render the jury's decision arbitrary or unreliable under the Eighth and Fourteenth Amendments to the United States Constitution." *Cauthern*, 967 S.W.2d at 738. The district court found that this decision did not contradict clearly established law, nor was it an unreasonable application of law to the facts of this case.

We, however, find that the Tennessee Supreme Court's decision was an unreasonable application of clearly established federal law.[8] The full reasoning of the state court was that:

> [T]he argument, while highly improper, did not affect the verdict to the prejudice of the defendant. The remarks in question were only a portion of the prosecutor's summation. Although no curative measures were taken by the trial court or the prosecution, this was primarily because the defense failed to object. We suggest, however, that this is a case in which the *sua sponte* intervention by the trial court would have been appropriate. It appears that the prosecution's motivation in making the argument was to respond to defense counsel's assertion that the defendant should not receive a death penalty in a civilized society and also to rebut the defendant's evidence of his rehabilitative potential. Finally, the misconduct must be viewed together with the overall record

---

[8]Petitioner, in his reply brief, argues that because of the Supreme Court's decision in *Parker v. Matthews*, 567 U.S. ___, 132 S. Ct. 2148 (2012), AEDPA no longer controls this case, and he is entitled to *de novo* review, because the Tennessee Supreme Court's decision applied the Sixth Circuit's multi-step analysis for prosecutorial misconduct. The argument is that *Parker* overturned this Circuit's multi-step analysis, and so the Tennessee Supreme Court's decision, which tracks that analysis, was in violation of clearly established law, because the state court should have applied the *Darden* approach. But the Tennessee Court did analyze this claim pursuant to *Darden*; the Sixth Circuit approach purportedly criticized in *Parker* was a means of addressing one of the prongs under *Darden*. In addition, eliminating this Circuit's approach to *Darden* would not benefit Petitioner, because this Circuit has far more extensive case law governing the flagrancy of prosecutorial arguments. Finally, there is no basis for Petitioner's claim that the change in law entitles him to *de novo* review. The state court was not entitled to violate clearly established federal law, but unless its application of the now-defunct (for the purposes of habeas review) Sixth Circuit test for flagrancy was itself a violation of clearly established federal law, then this Court cannot overturn that decision. In *Parker*, the criticism of this Court's reasoning was simply that this Court used its own precedents as the basis for clearly established law.

and the overwhelming strength of the State's case. The evidence supported the aggravating factor relied on by the State, as well as a finding that this factor outweighed the evidence of mitigating factors.

*Cauthern*, 967 S.W.2d at 737–38 (internal citations and footnotes omitted). However, in light of Supreme Court precedent, this conclusion is entirely unreasonable.

The prosecutor's remarks were, as both the district court and the Tennessee Supreme Court found, clearly improper. Respondent also agrees that the prosecutor's remarks at sentencing were improper. And there is no reasonable conclusion that one can draw from these remarks except that a jury would be inflamed by them. The prosecutor's remarks amounted to a litany of the kinds of remarks that courts disfavor. The prosecutor compared Petitioner to two of the most widely despised criminals of the then-recent past, one of whom was a serial killer who had tortured and raped his victims before murdering and dismembering them, and the other of whom was a child-murderer who after drowning her two sons triggered a nationwide manhunt when she fabricated a racially charged story that blamed the crime on a nonexistent black man. These remarks were solely inflammatory; and while we do not diminish the seriousness of Petitioner's crime, the Smith and Dahmer cases bore no relevant similarity to the crimes committed by Petitioner.

In addition, the prosecutor made biblical references, repeatedly referring to Petitioner as "the evil one," and referring to the Lord's Prayer. These types of references are particularly inappropriate in a sentencing proceeding, because they can create the inference that the death penalty is mandatory through their appeal to a higher authority, and because they allow a jury to delegate its own responsibility for the imposition of the sentence. *See, e.g.*, *Romine v. Head*, 253 F.3d 1349, 1366 (11th Cir. 2001); *Sandoval v. Calderon*, 241 F.3d 765, 777–78 (9th Cir. 2000); *Coe v. Bell*, 161 F.3d 320, 351 (6th Cir. 1998). The prosecutor made references that would encourage the jury to personally identify with the victims, and to feel as though failing to return sentence of death would endanger the families of the jury. The prosecutor included an appeal to the duty of the jury, which is a form of argument that the Supreme Court has expressly criticized. *See United States v. Young*, 470 U.S. 1, 18 (1985). While not binding as clearly established

law, we note that the remarks here bear some resemblance to those in *Bates v. Bell*, 402 F.3d 635, 648 (6th Cir. 2005), cert. denied, 126 S. Ct. 163 (2005) ("The prosecutors made it a theme of their summation that the jury's failure to sentence Bates to death would be akin to ordering the execution of Bates's next victim. Voting for a life sentence for this 'rabid dog' was equivalent to putting a gun in his hand.").

The Tennessee Supreme Court also found that the remarks were only a part of the prosecutor's summation, but as Petitioner points out, up to 80% of the rebuttal was dedicated to improper argument, and the rebuttal was the final thing the jury heard before it met to decide upon a sentence. Ultimately, the question of whether Petitioner is entitled to relief hinges on the likelihood that the remarks prejudiced the defendant such that we can no longer be confident in the jury's sentence of death. *Bates*, 402 F.3d at 641 ("Rather than determining whether a constitutional error would have pushed a jury from a 'not guilty' verdict to a 'guilty' verdict, we must attempt to discover whether the constitutional error influenced the jury's decision between life and death."). Based on the number of abuses and the egregiousness of the prosecutor's conduct, we are convinced that no reasonable jurist could be confident in the result as returned by the jury.

While the district court found that the record supported the Tennessee's Supreme Court's findings that the remarks did not unduly influence the jury, we see no reasoned basis for that conclusion anywhere in the opinion. The district court noted that there was a great deal of evidence about Petitioner's guilt, but the weight of the evidence of guilt is completely and totally irrelevant to this inquiry. *See Gregg v. Georgia*, 428 U.S. 153, 190–92 (1976) (discussing the advantages of bifurcated sentencing procedures in capital cases). One would hope that when a state court convenes to determine whether a defendant should be put to death that there would no longer be any lingering question of that defendant's guilt. The district court also noted that the trial court gave the curative instruction that statements by lawyers are not evidence. But that generic instruction would likely have been given regardless of what the prosecutor said; were we to accept the reasoning of the district court on this point, then there would never be

a viable claim for prosecutorial misconduct, because the most basic of instructions would cure the potential for an inflamed jury. The district court further noted that the prosecutor's remarks were invited by the defense attorney, without explaining why that would matter with respect to our confidence in the decision reached. The district court also pointed out that the jury was unlikely to have been convinced that Petitioner was actually the devil. While that may be true, its real relevance is that it highlights the outlandish nature of the prosecutor's remarks. And one would not need to believe that Petitioner was himself the devil in order to have been improperly inflamed such that the verdict cannot be trusted.

Respondent argues (and the district court found) that because the jury returned only one sentence of death, for the murder of Rosemary, and returned only a sentence of life imprisonment for the murder of Patrick, we can assume that the jury was not improperly inflamed, because the prosecutor's remarks applied with equal force to both murders. But this argument is irrational; there were differences between the two murders, and it is equally plausible that given the high burden for imposing a death sentence, the remarks were what tipped the scale in favor of imposing such a sentence for the murder of Rosemary. Petitioner presented mitigating evidence, and there was a co-defendant, who was at least equally culpable, who was not sentenced to death. Given these facts, and given the extensive and egregious nature of the prosecutor's remarks, we cannot be confident in the result returned by the jury. Based on the quantity of prosecutorial misconduct, as well as the severity of that misconduct, no reasonable jurist could be confident that Petitioner was accorded a fair proceeding. Accordingly, we grant the petition for a writ of habeas corpus on the basis of prosecutorial misconduct.

### IV.    Petitioner's *Eddings* Claim

Petitioner argues that he should have been allowed to introduce a letter from his son as mitigation evidence at his resentencing. The letter read in full:

Dear Dad,

I Love you Dad. I hope I come again gen [sic].  Some time.  we went to Chuck [sic] Cheese.  We went to Wall [sic] Mart and we had fun.

Love always, Ryan

*State v. Cauthern*, 967 S.W.2d 726, 738 (Tenn. 1998).  The letter was excluded because the trial court found that "it was of negligible probative value and was cumulative to the other evidence presented."  *Id.*  The Tennessee Supreme Court, in its review of that decision, found that the failure to admit the evidence was harmless error, *id.* at 738–39, and it is that decision that is reviewed by this Court.  The district court found that the state court decision not to admit the evidence was neither contrary to, nor an unreasonable application of, clearly established federal law, but later granted a certificate of appealability on the narrower of question of whether the Tennessee Supreme Court's holding that this was subject to harmless-error analysis violated the Constitution.

Petitioner alleges that the Tennessee Supreme Court's decision was an unreasonable application of clearly established law because it evaluated this claim through the rubric of harmless-error analysis, rather than regarding the error as a structural flaw requiring resentencing.  At the outset, we note that no party appears to contest that the original decision not to admit the evidence was an error.  There is no question that a defendant subject to the death penalty is permitted to introduce a wide range of evidence in mitigation.  Failure to permit the sentencer to consider mitigation is a violation of the Eighth and Fourteenth Amendments to the federal Constitution. *Cauthern*, 967 S.W.2d at 738 (citing *McKoy v. North Carolina*, 494 U.S. 433, 442 (1990)).  As the Supreme Court found in *Eddings v. Oklahoma*, 455 U.S. 104 (1982), "the sentencer [may not] refuse to consider, *as a matter of law*, any relevant mitigating evidence." *Id.* at 114 (extending the rule from *Lockett v. Ohio*, 438 U.S. 586 (1978), that barred states from precluding mitigation evidence by statute) (emphasis in original). "The Constitution *requires* States to allow consideration of mitigating evidence in capital cases.  Any barrier to such consideration must therefore fall." *McKoy* 494 U.S. at 442 (1990) (emphasis in original).

In this case, the state court reasoned that while the trial court had erred in refusing to allow the evidence in, there was no basis upon which to overturn the conviction, because that error was harmless. It was harmless because the crucial points that a sentencing jury could glean from the evidence were permitted as mitigation evidence; the jury knew that Petitioner had a son who visited him regularly, and had seen a picture of Petitioner with his son. *Cauthern*, 967 S.W.2d at 739. The lower court had further instructed the jury that they could consider the fact that Petitioner had a minor son as a mitigating factor. *Id.* Therefore, the evidence did not affect the jury's verdict. *Id.* Petitioner now challenges the district court's determination that this was neither an unreasonable application of, nor contrary to, clearly established law because, he claims, the Tennessee Court of Criminal Appeals should have found that the failure to admit the evidence was structural, and thus required resentencing.

There is no clearly established federal law requiring states to review trial court's decisions regarding admission of mitigating or aggravating factors as structural defects. While the Supreme Court has remanded death sentences on the basis of the exclusion of relevant mitigation evidence, it has never categorically stated that it is improper for a state court to analyze such a claim as a matter of harmless error. The strongest possible precedent for Petitioner's argument is the Supreme Court's decision in *Skipper v. South Carolina*, 476 U.S. 1 (1986). In that case, the Supreme Court found that:

> The exclusion by the state trial court of relevant mitigating evidence impeded the sentencing jury's ability to carry out its task of considering all relevant facets of the character and record of the individual offender. The resulting death sentence cannot stand, although the State is of course not precluded from again seeking to impose the death sentence, provided that it does so through a new sentencing hearing at which petitioner is permitted to present any and all relevant mitigating evidence that is available.

*Id.* at 8 (citation omitted). Furthermore, "[u]nder our decisions, it is not relevant whether the barrier to the sentencer's consideration of all mitigating evidence is interposed by statute, by the sentencing court, or by an evidentiary ruling." *Mills v. Maryland*, 486 U.S. 367, 374 (1988).

While those cases present a relatively strong argument for Petitioner, it is not enough to overcome the AEDPA standard. In those cases, the issue was that the mitigation evidence had been excluded entirely; the jury had not been able to consider the argument for mitigation at all, or had (as in *Mills*) misunderstood its directions such that it chose not to consider the evidence. Therefore, in those cases, harmless error analysis was impossible. *See Davis v. Coyle*, 475 F.3d 774–75 (6th Cir. 2007) (discussing possible remedies when a court improperly excludes mitigating evidence). But in this case, the Court of Criminal Appeals found that the only relevant piece of information was cumulative. Here, the Tennessee Courts were able to review the determinations and find that the error was harmless, given that the jury heard evidence as to the same mitigation factor to which the excluded evidence would have gone.

In addition, the Supreme Court has repeatedly held that states can review mitigation decisions on the basis of harmless error review when the issue is the weighing of aggravating and mitigating factors. *See Parker v. Dugger*, 498 U.S. 308, 319 (1991); *Clemons v. Mississippi*, 494 U.S. 738, 752 (1990) ("Even if under Mississippi law, the weighing of aggravating and mitigating circumstances were not an appellate, but a jury, function, it was open to the Mississippi Supreme Court to find that the error which occurred during the sentencing proceeding was harmless.")

Finally, it should be noted that the federal statute authorizing review of a federal death sentence specifies that "[t]he court of appeals shall not reverse or vacate a sentence of death on account of any error which can be harmless, including any erroneous special finding of an aggravating factor, where the Government establishes beyond a reasonable doubt that the error was harmless." 18 U.S.C. § 3595(c). It would be strange to find that the federal Constitution demands a particular form of review for state court errors regarding mitigation evidence when it does not demand the same on direct appellate review of federal death sentences.

Accordingly, the state court decision with respect to the entry of this mitigation evidence did not violate clearly established law when it applied harmless error analysis to the lower court's evidentiary ruling.

## V.        Petitioner's *Brady* Claim

Petitioner claims that the state courts erred in failing to reverse his conviction on the basis that the state withheld material exculpatory evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1967). Specifically, Petitioner claims that there were three pieces of information that should have been turned over to him: a police report from January 23, 1987 prepared by Detective R.J. DiFiore, which addressed an interview with James Andrew, a witness for the prosecution; the fact that Andrew had received money from the police in exchange for his statement to the police; and finally, the fact that Andrew's car had been vandalized after Petitioner was arrested.[9]

The police report memorialized the original statement given to the police by Andrew. According to the report, Eric Barbee, a friend of Patterson's, had come to Andrew's home, and told Andrew to contact Patterson's attorney to report that Patterson had stayed in the car while Petitioner committed the rape and murders, and to further report that he had not seen Petitioner with Patterson on the night of the murders. Petitioner alleges that the prosecution also suppressed evidence that Andrew had contacted the police expecting to receive a $5,000.00 reward, and did in fact receive some amount of money. Finally, Petitioner alleges that the prosecution suppressed evidence that Andrew's car had been vandalized, sometime after Petitioner was arrested and after Barbee had contacted Andrew. The Tennessee Court of Criminal Appeals found that while the evidence was favorable to Petitioner, and had been suppressed, *Cauthern v. State*, 145 S.W.3d 571, 621 (Tenn. Crim. App. 2004), this evidence was not material; because Petitioner had not shown that had it been disclosed to him, there was a reasonable probability that the result of either the trial or the resentencing would have

---

[9]Andrew's testimony at the original trial mentioned various admissions by Petitioner regarding the rape and murder. In addition, as the district court stated:

> Andrew was the State's final witness at the 1995 resentencing hearing. Although Andrew's testimony in 1988 about the murders . . . had faded by the time of the 1995 resentencing hearing, he repeated his earlier testimony that the petitioner admitted having raped Rosemary, adding that the petitioner viewed raping her as a "great trophy," and that he was "proud of it."

(R. 167, Mar. 31, 2010, Opinion, at 27.)

been different. *Id.* The district court found that the state court's determination did not give rise to habeas relief, and declined to grant the writ on the basis of the alleged *Brady* violations.

Under *Brady*, a defendant's rights under the Due Process Clause are violated when a state suppresses material exculpatory information. *Brady v. Maryland*, 373 U.S. 83, 87 (1963). The Supreme Court has stated that the elements of a *Brady* claim are: "The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 381–82 (1999). In this case, the state court found that the evidence was favorable and had been suppressed, but was not material.[10] *Cauthern*, 145 S.W.3d at 619. Accordingly, the court declined to reverse either Petitioner's conviction or sentence on the basis of *Brady* violations.

To determine if evidence is material, courts must use the standard of reasonable probability; if there is a reasonable probability that, had the evidence been turned over, the underlying proceeding would have had a different result, then the evidence is material. *Youngblood v. West Virginia*, 547 U.S. 867, 870 (2006). "The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Strickler*, 527 U.S. at 289–90 (quoting *Kyles v. Whitley*, 514 U.S. 419, 434 (1995)) (internal quotation marks and citations omitted). Additionally, a court examining the materiality of evidence under *Brady* examines the evidence in its totality, rather than as a series of individual items. *Kyles*, 514 U.S. at 436–37.

---

[10]The Tennessee Court of Appeals specifically held that "the state does not earnestly contest the two findings [that the state suppressed the evidence], although it does argue that some of the information seemed to be available to both parties." *Cauthern*, 145 S.W.3d at 620. The court did not challenge the lower court's finding with respect to suppression of the evidence, nor did it find that evidence of vandalism was ineligible for *Brady* treatment on that ground.

Petitioner alleges that this evidence was material because it could have been used to impeach Andrew's testimony at both the original trial and the resentencing hearing.[11] During state collateral proceedings, the Tennessee Court of Criminal Appeals found that the evidence was immaterial, because even if Andrew's credibility had been completely undermined, the verdict would have remained intact. This was in part because Petitioner was convicted under the felony-murder rule, and accordingly, there was no need for the state to prove that Petitioner had himself killed the Smiths. Therefore, even without Andrew's testimony as to Petitioner's admissions, there was sufficient proof of Petitioner's guilt to support the verdict. *Cauthern*, 145 S.W.3d at 620. It further reasoned that the testimony as to Barbee's attempt to influence Andrew was irrelevant because Andrew gave a statement to police before Barbee contacted him, and in any event, Andrew's testimony did not negate Patterson's involvement in the crimes, which was the reason Barbee contacted him. Finally, even without evidence of Andrew's monetary reward, the resentencing jury declined to impose a death penalty for one killing, and the distinguishing factor of the other killing was that the victim was tortured, a topic to which Andrew's testimony had no relevance. *Id.* at 621.

Petitioner presents no substantive argument that the state court's decision violated clearly established law. His most compelling argument is that because his claim at sentencing related to relative culpability between him and Patterson, the evidence that Patterson attempted to tamper with the witness was material to the jury's determination of greater relative culpability. But even had that evidence come in, the state court's judgment would still have been supported by another witness' account that Petitioner had raped Rosemary. And Petitioner cites no cases in support of his argument, nor can the author find any supporting Supreme Court precedent for the contention that relative culpability gives rise to a definite inference of materiality under *Brady*.

Furthermore, although Andrew's discussion of Petitioner's boasts about killing Rosemary might have influenced the jury to impose a sentence of death, it was not the

---

[11]Andrew did not testify at the post-conviction evidentiary hearing, but the parties agreed to stipulate to what he would have said.

only evidence supporting that sentence. Petitioner does not show any clearly established law that would suggest that his inability to impeach Andrew would have affected the jury's decision given the overwhelming physical evidence that Rosemary was tortured. Because Andrew's testimony at the resentencing was relatively brief, and there was overwhelming evidence as to the key points of his testimony, the Tennessee court's finding that his impeachment would not have undermined confidence in the outcome is not reversible under AEPDA's deferential standard of review.

Accordingly, the decision of the district court to deny Petitioner's claim for habeas relief under *Brady* is affirmed.

## VI.       Ineffective Assistance of Counsel

### A.       Standard of Review

The standard of review for this claim, as well as the governing law under AEDPA is the same as provided in the earlier section of this decision; however, it should be noted that the Supreme Court has made clear that claims under *Strickland* are extremely difficult under AEDPA:

> Surmounting *Strickland*'s high bar is never an easy task. . . . Even under *de novo* review, the standard for judging counsel's representation is a most deferential one. . . .
>
> Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult. The standards created by *Strickland* and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so . . . . [T]he question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard.

*Richter*, 131 S. Ct. at 787–88 (citations and internal quotation marks omitted).

## B.       Petitioner's claim of ineffective assistance of counsel

Petitioner's next claim is that his counsel was ineffective because it failed to adequately investigate or present his claims for mitigation. The district court summarized these claims as failure to:

> 1) present testimony from his step-siblings; 2) present testimony from family friends and the petitioner's ex-wife; 3) retain investigative and expert assistance and present expert testimony; 4) investigate Patterson's background 5) cross-examine Andrew adequately; 6) challenge Denning's testimony about the wine coolers when no physical evidence or expert testimony had been presented to support his testimony; 7) comply with the ABA standards for defense counsel in a capital case; 8) explain or present the petitioner's life history, character and background, or explain the crime, i.e., present mitigating evidence persuasively, or object to the trial court's ruling that the jury could not consider Patterson's life sentence as mitigating evidence; and 9) present available mitigating evidence, thereby undermining the confidence in the integrity of the petitioner's death sentence.

(R. 167, Mar. 31, 2010, Opinion, at 69.)

The question of ineffective assistance of counsel is analyzed pursuant to the two-part test established in *Strickland v. Washington*, 466 U.S. 668 (1984). Petitioner must show that counsel's performance was objectively unreasonable, and that he was prejudiced because of this ineffective assistance.

Counsel's performance is deficient where it falls below an objectively reasonable standard. *Strickland*, 466 U.S. at 686–87; *Richter*, 131 S. Ct. at 787. "A court considering a claim of ineffective assistance must apply a 'strong presumption' that counsel's representation was within the 'wide range' of reasonable professional assistance." *Richter*, 131 S. Ct. at 787 (quoting *Strickland*, 466 U.S. at 689). Petitioner bears the burden of overcoming the "presumption that the challenged conduct might be considered sound trial strategy." *Hanna*, 694 F.3d at 612. That is to say, Petitioner must show that counsel made errors "so serious that counsel was not functioning as the counsel guaranteed the defendant by the Sixth Amendment." *Richter*, 131 S. Ct. at 787 (internal quotation marks omitted).

"To establish *Strickland* prejudice a defendant must 'show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Lafler*, 132 S. Ct. at 1384 (quoting *Strickland*, 466 U.S. at 694). "'A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" *Richter*, 131 S. Ct. at 787 (quoting *Strickland*, 466 U.S. at 694). "Counsel's errors must be so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* at 787–88 (internal quotation marks omitted).

### 1.    Petitioner's Claim of Ineffective Assistance Due to Counsel's Failure to Present Testimony of His Step-Siblings

Petitioner's first claim for ineffective assistance of counsel was that his attorney failed to present testimony at his sentencing hearing from Petitioner's step-siblings as to his abusive childhood. Three of his step-siblings, Melinda Cauthern Allen, Roy "Bud" Cauthern, Jr., and Eveann Cauthern Palmer, later testified at a post-conviction evidentiary hearing.[12] Their testimony detailed a litany of abuse, mostly inflicted by

---

[12]The Tennessee Court of Appeals described Petitioner's family background at some length:

The petitioner was born in Tennessee on September 5, 1967. His biological parents were Raymond Huhn, a German citizen, and Christine Tatteryn Huhn, a Canadian citizen. During Christine Huhn's pregnancy, Raymond Huhn was arrested for burglary and imprisoned in California. Needing a place to live, Christine Huhn contacted her mother-in-law, Dagmar Huhn Cauthern, who lived in Tennessee and who invited Christine Huhn to stay with the Cauthern family.

Dagmar Huhn's husband, Roy Cauthern, Sr., had served in the military during World War II. Evidently, while he was stationed in Germany, he met his future wife, a German citizen who ultimately became a casualty of the Allied bombings of that country. Little is known of Dagmar Huhn's life in Germany other than giving birth to one child, Raymond. Many years after the surrender of Germany and Japan, Dagmar Huhn immigrated to the United States and renewed her acquaintance with Roy Cauthern, Sr. He had been recently widowed in 1962, and he was a single parent to four children: Melinda, Mary Louise, Eveann, and Roy Cauthern, Jr. In February of 1963, Dagmar Huhn and Roy Cauthern, Sr. were married.

Christine Huhn gave birth in 1967 to the petitioner while she was living with the Cauthers. When the petitioner was approximately six weeks old, Dagmar Cauthern prevailed upon Christine Huhn to return to California to divorce Raymond Huhn. When Christine Huhn left, Dagmar Cauthern then reported that Christine had abandoned her child, which allowed Dagmar and Roy Cauthern to officially adopt the petitioner. The petitioner first learned of his adopted status when he was a teenager and discovered his birth certificate.

By the time of the post-conviction hearings in 2000 and 2001, the petitioner's biological parents were deceased. His adoptive father, Roy Cauthern, died in 1997, and his adoptive mother/biological grandmother, Dagmar Cauthern, was suffering from Parkinson's Disease and living in a nursing home. His stepsister, Mary Louise,

Dagmar Cauthern, Petitioner's grandmother.  That abuse included physical abuse with brooms, belts and other implements.  The abuse was largely unpredictable.  There was also emotional abuse, including the isolation of the children from friends, and verbal insults.  In addition, home discipline was rigidly enforced with the threat of physical violence and deprivation of food.

The Tennessee Court of Criminal Appeals found that this did not give rise to a claim for ineffective assistance of counsel, because Petitioner failed to show that his trial counsel's representation was deficient, and because there was no prejudice.  The deficiency argument was based largely upon the fact that:

> [T]he post-conviction court found that background family information was not readily available to trial counsel.  From the testimony and demeanor of the petitioner's step-siblings, former wife, and the Popes, the court was convinced that Roy Cauthern "would have done everything in his power to prevent witnesses from offering any testimony which did not cast Dagmar in a favorable light" and that he would not have "permitted his children to discuss family issues with trial counsel, an expert witness, or a jury."  As for the Popes and Bud and Melinda Cauthern, the court did not believe that they would have assisted with the petitioner's defense unless Roy Cauthern had consented.  According to the court, the only lay witnesses "who even arguably would have cooperated [were] EveAnn and Lucinda."

*Cauthern v. State*, 145 S.W.3d at 606 (alterations in original).

Before this Court, Petitioner contends—and the state does not meaningfully contest—that the failure of counsel to investigate his family constituted deficient performance.  An unexplained failure to investigate possible mitigation evidence is objectively unreasonable conduct by an attorney in a capital case.  *See Wiggins v. Smith*, 539 U.S. 510, 521–22 (2003).  As the Supreme Court found in *Strickland*:

> [S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable

---

succumbed to leukemia in 1980, but the other step-siblings were alive.

*Cauthern v. State*, 145 S.W.3d at 583.

precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

*Strickland*, 466 U.S. at 521–22 (quoted with approval in *Wiggins*); *see also Porter v. McCollum*, 558 U.S. 30, 39–40 (2009). But here, there is no evidence anywhere in the record that explains counsel's failure to speak to Petitioner's step-siblings. The district court summarized defense counsel's explanations as:

> Attorney Poland, lead defense counsel at both the 1988 trial and 1995 resentencing hearing, testified at the post-conviction evidentiary hearing that he did not contact the petitioner's step-siblings, but that the petitioner also did not bring anything to his attention that would have caused him to suspect that the petitioner's home life might be of value to the defense. Attorney Poland also testified that he did seek family background information from the petitioner's adoptive parents but "wasn't too successful . . . "Attorney Bateman, co-counsel at the 1995 resentencing hearing, testified that he "had some background from discussions with Mr. Poland and Mr. Cauthern . . . ," but admitted that he did not meet or speak with the petitioner's step-siblings.

(R. 167, Mar. 31, 2010, Opinion, at 73.) Even if one assumes that the testimony of two of the step-siblings suggests that the state court did not err when it found that they might not even have testified unless it was acceptable to their father (who had died by the time the post-conviction hearing took place), that would only go to possible prejudice; the failure to contact the siblings at all was simply deficient performance. Were it true that the siblings would not have testified, then a court could plausibly find that there was no prejudice because of counsel's failure to investigate the possibility of their testimony. But to fail to investigate a defendant's nearest relatives at all is deficient performance, regardless of what the end result might have been.

Based on the testimony of the step-siblings, there was no factual basis for the state court's finding that they would not have testified. While Melinda, when asked if she would have assisted Petitioner in 1987, said "I doubt it," she immediately afterwards

added that she would have helped if properly approached in 1988 or 1995. (Joint App'x at 1227–1228.)  Roy admitted that he might not have done it if it would have been hurtful to their father, but also added that he assumed his father would have wanted him to testify.  (*Id.* at 1336–37.)  And Eveann was unequivocal in stating  that she would have testified on Petitioner's behalf.  (*Id.* at 1370–71.)  Therefore, even if this Court defers entirely to the state court's findings with respect to Roy and Melinda, there would still be a finding of deficient performance, because at least one of these step-siblings would have testified, and only one was necessary to elicit the relevant information.

Moreover, even were the failure to investigate based on some sort of strategic decision—and unlike a decision not to have a potential witness testify after an investigation, it is hard to imagine what that strategy would be—"[t]he relevant question is not whether counsel's choices were strategic, but whether they were reasonable." *Roe v. Flores-Ortega*, 528 U.S. 470, 481 (2000).  In addition, as the Supreme Court recently found, "[w]e certainly have never held that counsel's effort to present some mitigation evidence should foreclose an inquiry into whether a facially deficient mitigation investigation might have prejudiced the defendant." *Sears v. Upton*, ___ U.S. ___, 130 S. Ct. 3259, 3266 (2010).

Though the issue was effectively foreclosed by the state's finding of no deficient performance, and there was no need to address the second prong of *Strickland*, the state court went on to find a lack of prejudice, arguing that:

> Even though the petitioner's step-siblings undoubtedly endured abusive, isolated childhoods, it is by no means obvious from the proof that the petitioner's childhood rivaled theirs.  The evidence does not preponderate against the post-conviction court's assessment that the petitioner led "a charmed life in comparison to his siblings, that he wasted his opportunity to become a productive citizen despite [his adopted father's] attempts to foster his car-repair skills, and that he abandoned his wife and child."  To be sure, evidence about life in the Cauthern household would have been admissible during the penalty retrial; however, the test for prejudice in the post-conviction, ineffective assistance context is more exacting. [T]he quality of the proposed testimony rather than the quantity of witnesses determines whether prejudice has been established.

> In our opinion, the family-history evidence is, at best, marginal in terms of illuminating the case in such a way as to undermine confidence in the jury's sentencing decision. At worst, the evidence is reminiscent of the adage in *Strouth v. State*, 755 S.W.2d 819, 827 (Tenn. Crim. App.1986), that "while many people have unhappy childhoods, [few commit brutal murders]." Inasmuch as the petitioner's step-siblings do not manifest obvious antisocial traits or violent tendencies, a jury reasonably could reject, or be insulted by, any suggestion that the petitioner's criminal actions were attributable to a disadvantaged background.

*Cauthern v. State*, 145 S.W.3d at 609 (some citations and quotation marks omitted).

But this is an unreasonable interpretation of federal law. First, as noted above, a criminal defendant, particularly in a death penalty case, is given wide latitude in the introduction of mitigation evidence. *See Eddings v. Oklahoma*, 455 U.S. 104 (1982). Next, it is clearly established law that evidence of abuse is significant to a jury's determination of moral culpability. The Supreme Court has held that "the graphic description of [Petitioner's] childhood, filled with abuse and privation, or the reality that he was 'borderline mentally retarded,' might well have influenced the jury's appraisal of his moral culpability." *Williams v. Taylor*, 529 U.S. 362, 398 (2000); *see Penry v. Lynaugh*, 492 U.S. 302, 315 (requiring jury to be able "to fully consider and give effect to the mitigating evidence of [Petitioner's] mental retardation and abused background.") (abrogated on other grounds by *Atkins v. Virginia*, 536 U.S. 304 (2002)). The Tennessee Court of Criminal Appeals found that the failure to present this evidence was not prejudicial, because "a jury reasonably could reject, or be insulted by, any suggestion that the petitioner's criminal actions were attributable to a disadvantaged background." *Cauthern v. State*, 145 S.W.3d 571, 609 (Tenn. Crim. App. 2004). But that kind of speculation is precisely why the failure to introduce this evidence was prejudicial. While some degree of speculation is necessary in determining prejudice, *Goodwin v. Johnson*, 632 F.3d 301, 328 (6th Cir. 2011) (citing *Sears*, 130 S. Ct. at 3265–66 (2010)), the state court's speculation was inapposite. The fact that the jury might have taken this evidence as proof that Petitioner's childhood did not mitigate his culpability does not eliminate the possibility that there was a reasonable probability that the jury would have found that it did mitigate his culpability. Without citing a single federal case, the Tennessee court

found that this evidence would not have led a reasonable jury to find a lesser degree of moral culpability. But the only other evidence of the potential impact of abuse on Petitioner consisted of his own testimony, which is on its face less compelling than the testimony of a less interested party. Testimony from his siblings could very well have elicited sympathy, or given the jury greater reason to consider life imprisonment. *See e.g.*, *Johnson v. Mitchell*, 585 F.3d 923, 941–43 (6th Cir. 2009) (finding that defense counsel's failure to investigate leads that might have led to evidence of abuse was ineffective, and that the state court's determination of the opposite conclusion violated clearly established law). The Tennessee court's decision was therefore an unreasonable application of the law, given the facts in this case, and accordingly, the decision of the district court is reversed.

> **2.      Petitioner's Claim of Ineffective Assistance Due to Counsel's Failure Investigate Patterson's Involvement in a Similar Crime in New Mexico**

Petitioner's next claim for ineffective assistance of counsel is that trial counsel failed to adequately investigate Patterson's background. Patterson was suspected of a rape and murder in New Mexico. Petitioner argues that had this information been available, and presented to the jury, it would have supported his theory that Patterson had greater moral culpability.[13] The Tennessee Court of Criminal Appeals found that:

> The petitioner charges that had trial counsel investigated Patterson's background, counsel would have discovered that Patterson was a suspect in the strangulation death of a woman in New Mexico. The petitioner, however, fails to explain why trial counsel should have set out on such a course of investigation prior to his 1988 trial or even how such information relating to an unsolved homicide would have been uncovered. The petitioner has offered no evidence of deficient performance on this point in connection with his 1988 trial. Furthermore, as the post-conviction court noted, assuming the evidence could be categorized as relevant for some non-propensity purpose, the petitioner has not shown by clear and convincing evidence that Patterson

---

[13]Petitioner originally brought this argument with respect to both his trial and sentencing, but now pursues the argument only as it relates to the 1995 resentencing.

actually committed the offense. The failure to establish a proper foundation would have resulted in the exclusion of the evidence.

The petitioner then shifts to his 1995 resentencing trial. By that time, the petitioner claims, Patterson's suspected involvement in the New Mexico homicide was known through other proceedings. The petitioner criticizes counsel for not independently investigating "this startling information" once it came to light, but there appears to be little to investigate. The testimony of the New Mexico law enforcement officers at the post-conviction hearing was not particularly revealing or useful beyond the initial proposition that Patterson was a suspect.

*Cauthern v. State*, 145 S.W.3d at 616.

On this claim, however, Petitioner cannot show deficient performance. First, it is unclear that a reasonable investigation would have turned up this evidence before trial. Even assuming that Petitioner could show deficient performance, it was not unreasonable for the state court to find that there was no prejudice as to this evidence. The evidence tying Patterson to the New Mexico killing was inadmissible in the proceedings before the trial court. *Id.* at 597. The case against Patterson in New Mexico remains technically unsolved, and as the district court found, a reasonable juror would not have concluded that the evidence from the 1981 killing in New Mexico had any bearing on Petitioner's relative culpability, especially as an existing witness had already put Patterson's admissions regarding his lead role in the killings before the jury. *Id.* This evidence might have reasonably found Patterson to be more culpable and thus resulted in his being sentenced to death, but the evidence is of no importance with respect to Petitioner's culpability, given the otherwise overwhelming evidence of Petitioner's guilt. Accordingly, because even if the investigation was deficient, there was no prejudice based on its failure, Petitioner's claim with respect to the evidence of Patterson's involvement in the New Mexico killing is denied.

### VII. The Court's Use of the "Heinous, Atrocious, or Cruel" Aggravating Factor

Petitioner's final claim is that Tennessee's use of the "heinous, atrocious, or cruel" ("HAC") aggravating factor is unconstitutionally vague. Particularly, he claims

that the state court erred when it found that the trial court's error in using the incorrect version of the aggravating statute was harmless. The clearly established standard for evaluating whether a constitutional error was harmless is that the state must show "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *Chapman v. California*, 386 U.S. 18, 24 (1967).

Tennessee amended its HAC statute in 1989. Prior to 1989, the statute stated "[t]he murder was especially heinous, atrocious, or cruel in that it involved torture or depravity of mind." Tenn. Code Ann. § 39-2-203(i)(5)(1982). In 1989, the statute was amended to state that "[t]he murder was especially heinous, atrocious, or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death." Tenn. Code Ann. § 39-13-204(i)(5) (1991). At the 1995 resentencing the court used the post-1989 language. As the Tennessee Supreme Court found, this was error; the court should have used the version of the statute that was in effect at the time of the offense. *State v. Cauthern*, 967 S.W.2d 726, 732 (1998). But it found that the difference between the two statutes was harmless, in light of the court's instructions to the jury.

This decision was not contrary to or an unreasonable application of federal law. First, the Supreme Court has found that HAC aggravators are constitutionally permissible if construed so as to require "torture or serious physical abuse." *Maynard v. Cartwright*, 486 U.S. 356, 364–65 (1988). And as the district court found, the HAC language used by the state court, if accompanied by a limiting instruction, has been expressly approved of by the Supreme Court. *Bell v. Cone*, 543 U.S. 447, 455 (2005). In *Cone*, the Supreme Court stated that even if it assumed that the Sixth Circuit was correct when it found that Tennessee's HAC aggravator was unconstitutionally vague on its face, it could not presume that the state court had failed to cure this vagueness. *Id.* at 459–60.

At resentencing, the trial court gave explanations as to the terms used in the aggravating factor. It defined heinous, atrocious, or cruel according to the correct standard. *State v. Cauthern*, 967 S.W.2d at 732. It further defined torture correctly. *Id.* The only error in the court's instructions was the substitution of "serious physical abuse

beyond that necessary to produce death" in place of the older "depravity of mind" language.  But that error was inconsequential because there was ample evidence of torture. As the court found:

> The victim, Rosemary Smith, was placed in a closet, first enduring the mental anguish of her husband's murder in the next room. She then was raped twice, ridiculed, suffered through a bungled attempt at strangulation and strangled to death with a tourniquet device placed around her neck that caused massive damage to her throat and larynx. There was evidence that the victim struggled to save herself while still alive and conscious by attempting to release the pressure which was applied to her neck. After the blood supply was finally cut off at the end of the struggle, she may have lost consciousness in thirty seconds but remained alive for three to six minutes.

*Id.*

Accordingly, it was not a violation of clearly established law for the Tennessee Supreme Court to find this error harmless.  What law does exist with respect to Tennessee's HAC aggravator clearly supports the conclusion that the statute, with the limiting instructions given, is constitutional, and the difference in language between the two versions of the statute was irrelevant to the determination.  Therefore the decision of the district court with respect to this claim is affirmed.

## CONCLUSION

For the foregoing reasons, we **AFFIRM** the decision of the district court with respect to Petitioner's claims under *Eddings* and *Brady*, as well as with respect to state's use of the heinous, atrocious, or cruel aggravator at sentencing.  However, we **GRANT** the petition for a conditional writ of habeas corpus based on Petitioner's claims of ineffective assistance of counsel and prosecutorial misconduct, and order the state to commence resentencing proceedings for Petitioner within 180 days or vacate his sentence of death.

——————————

**DISSENT**

——————————

ROGERS, Circuit Judge, dissenting.  I join all but parts III. B. and VI. B. 1. of the majority's opinion.

First, the Tennessee Supreme Court was not unreasonable in finding insufficient prejudice from the prosecutor's clearly improper remarks.  Equating the defendant with the devil incarnate, Susan Smith, and Jeffery Dahmer was clearly improper.  But the Tennessee Supreme Court could reasonably find that this extreme and belabored metaphor did not cause the jury to impose the death sentence, in the face of the extraordinarily brutal facts of this case.  The Tennessee Supreme Court found that:

> The victim, Rosemary Smith, was placed in a closet, first enduring the mental anguish of her husband's murder in the next room. She then was raped twice, ridiculed, suffered through a bungled attempt at strangulation and strangled to death with a tourniquet device placed around her neck that caused massive damage to her throat and larynx. There was evidence that the victim struggled to save herself while still alive and conscious by attempting to release the pressure which was applied to her neck. After the blood supply was finally cut off at the end of the struggle, she may have lost consciousness in thirty seconds but remained alive for three to six minutes.

*State v. Cauthern*, 967 S.W.2d 726, 732 (Tenn. 1998).  Although the Tennessee Supreme Court's reasoning was brief with regard to the prejudice caused by the prosecutor's remarks, its central reasoning was clear: "the misconduct must be viewed together with the overall record and the overwhelming strength of the State's case.  The evidence supported the aggravating factor relied on by the State, as well as a finding that this factor outweighed the evidence of mitigating factors."  *Id.* at 737–38.

This analysis is a reasonable application of Supreme Court law.  It mirrors the reasoning used by the Court in *Darden v. Wainwright*, 477 U.S. 168 (1986). As the Supreme Court there explained, "it is not enough that the prosecutors' remarks were undesirable or even universally condemned.  The relevant question is whether the

prosecutors' comments so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Id.* at 181 (internal quotation marks omitted). In this case, as in *Darden*, "[t]he weight of the evidence against the petitioner was heavy; the overwhelming eyewitness and circumstantial evidence to support a finding of guilt on all charges reduce the likelihood that the jury's decision was influenced by the closing argument." *Id.* at 182 (internal quotation marks and citation omitted). Considering the substantial evidence of the grisly manner in which Rosemary was killed, it was reasonable to conclude that the prosecutor's remarks did not rise to the level of a due process violation because the jury would not have needed to rely on the prosecutor's remarks to find the aggravating factor.

The Tennessee Supreme Court also noted that the prosecutor's closing argument appeared to be a response to defense counsel's suggestion that a civilized society should not impose the death penalty and a rebuttal of Cauthern's evidence of his rehabilitative potential. *Cauthern*, 967 S.W.2d at 737–38. The concept of invited response was relied upon by the Supreme Court in *Darden*. There the Court explained that "the idea of 'invited response' is used not to excuse improper comments, but to determine the effect on the trial as a whole." *Darden*, 477 U.S. at 182. Whether the response is invited is relevant to the analysis because a prosecutor's improper remarks are less likely to affect the fairness of the trial if their purpose was merely to "right the scale" in response to a defendant's arguments. *United States v. Young*, 470 U.S. 1, 12–13 (1985). Although the prosecutor's remarks went well beyond what was necessary to respond to the defense, it was still reasonable for the state court to conclude that the prosecutor's remarks were less likely to cause prejudice in the context of the defense's commentary on the propriety of the death penalty in a civilized society.

The reasonableness of the state court's decision is buttressed by the fact that just last year the Supreme Court reminded us that "the *Darden* standard is a very general one, leaving courts 'more leeway . . . in reaching outcomes in case-by-case determinations.'" *Parker v. Matthews*, 132 S. Ct. 2148, 2155 (2012) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). The less specific a rule is, the more room there is for

disagreement over how the rule ought to apply, and the more likely a given application is to be reasonable. *Yarborough*, 541 U.S. at 664. The generality of the *Darden* standard makes it all the more difficult to find that the Tennessee Supreme Court's application of federal law was unreasonable.

Moreover, even if the Tennessee high court's analysis was so cryptic and unpersuasive as to be unreasonable, that would not necessarily mean that Cauthern succeeds on this appeal, but rather that we would decide de novo whether there was a constitutional violation. *See Rice v. White*, 660 F.3d 242, 257 (6th Cir. 2011). Under an independent application of the relevant standard from *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993), the error was harmless. First, the factors discussed above—the significant evidence of torture and the fact that defense counsel invited the prosecutor's response—weigh in favor of a finding of no injurious effect on the verdict. Next, almost immediately after the prosecutor's remarks, the judge instructed the jury that "[s]tatements, arguments and remarks of the lawyers . . . [are] not evidence" and later that the jury should make its decision based on the facts and not "sympathy or prejudice." Even if generic, such an instruction is still relevant in a harmless error review. The fact that the instructions were given is a factor that should be considered when evaluating the effect of an error on the verdict. The significant evidence before the jury along with the "important presumption that jurors followed the trial court's instructions," *United States v. Guzman*, 450 F.3d 627, 629 (6th Cir. 2006), provides a rational explanation for the sentence: the jury followed its instructions and sentenced Cauthern based on the evidence before it—not because of the prosecutor's egregious remarks.

The presumption that the jury followed the instructions it was given is bolstered by the fact that it sentenced Cauthern to death for Rosemary's death but not for Patrick's. The evidence before the jury much more clearly established that Rosemary's death was heinous, atrocious, or cruel. Rosemary heard her husband being killed, was raped twice, suffered through a botched strangling, and finally was killed in a particularly gruesome manner. Patrick's death, horrible as it was, did not have the same indicia of torture as

his wife's.  The jury's decision to impose different punishments does not definitively answer whether the remarks affected the verdict, but the fact that the jury behaved rationally enough to distinguish between the circumstances surrounding the murders is another factor that indicates the jury was weighing the evidence and not the prosecutor's improper remarks when it returned the death sentence.  Together, these facts indicate that the prosecutor's comments did not have a substantial and injurious effect on the verdict.

Second, the Tennessee Court of Criminal Appeals was not unreasonable in finding insufficient prejudice from defense counsel's failure to interview Cauthern's step-siblings.  Prejudice, the second prong of the *Strickland* analysis, is shown when "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Strickland v. Washington*, 466 U.S. 668, 694 (1985).  As the state court explained, if the step-siblings had testified, their testimony would not have been particularly helpful to Cauthern.  Each of his step-siblings would have testified that they had been abused by Dagmar (Cauthern's grandmother), but that Cauthern was favored as the "golden child" of the family. *Cauthern v. State*, 145 S.W.3d 571, 584 (Tenn. Crim. App. 2004) (finding that Melinda would have testified that Cauthern was "'the apple of [Dagmar's] eye'"); *id.* at 585 (finding that Bud would have testified that Cauthern was initially the favorite child but would be subject to unpredictable abuse when he became older); *id.* (finding that Eveann would have testified that she and Cauthern were "golden children").  Based on these findings, the Court of Criminal Appeals concluded that "[e]ven though the petitioner's step-siblings undoubtedly endured abusive, isolated childhoods, it is by no means obvious from the proof that the petitioner's childhood rivaled theirs." *Id.* at 609.  In fact, testimony from the step-siblings could well have hurt Cauthern because the jury could have concluded that Cauthern's step-siblings "do not manifest obvious antisocial traits or violent tendencies" despite having been subject to greater abuse at the hands of Dagmar. *Id.*  Concluding that there was no reasonable probability that the evidence of Cauthern's childhood would have changed the jury's imposition of the death penalty was not an unreasonable application of *Strickland*.

To be sure, the majority articulates reasonable bases for disagreeing with the Tennessee Supreme Court and the Court of Criminal Appeals on the two prejudice issues. But as the Supreme Court has repeatedly explained:

> an *unreasonable* application of federal law is different from an *incorrect* application of federal law. Indeed, a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must be objectively unreasonable. This distinction creates a substantially higher threshold for obtaining relief than *de novo* review. AEDPA thus imposes a highly deferential standard for evaluating state-court rulings, and demands that state-court decisions be given the benefit of the doubt.

*Renico v. Lett*, 559 U.S. 766, 773 (2010) (citations and internal quotation marks omitted).

In a meticulous 168-page opinion, District Judge Trauger thoughtfully and carefully disposed of multiple arguments presented by petitioner's counsel. I would affirm the judgment of the district court denying the habeas writ.