NOT RECOMMENDED FOR PUBLICATION
File Name: 17a0048n.06

No. 13-4253

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
Jan 20, 2017
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| ROBERT WILLIAMS, JR., | ) | |
| | ) | |
| Petitioner-Appellant, | ) | |
| | ) | ON APPEAL FROM THE |
| v. | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE NORTHERN |
| MARC C. HOUK, Warden, | ) | DISTRICT OF OHIO |
| | ) | |
| Respondent-Appellee. | ) | |
| | ) | |

**BEFORE: COLE, Chief Judge; WHITE, and DONALD, Circuit Judges.**

**HELENE N. WHITE, Circuit Judge.** Petitioner Robert Williams, Jr. was convicted by an Ohio jury of the aggravated murder, aggravated robbery, and rape of 88-year-old Velma McDowell, as well as the aggravated burglary of McDowell's apartment. Williams was sentenced to death for McDowell's murder and to three consecutive 10-year terms of imprisonment for the rape, robbery, and burglary. The Ohio courts upheld Williams's convictions and death sentence on direct appeal and in state postconviction proceedings. Williams then petitioned for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, asserting 19 grounds for relief. The district court denied the petition, but granted a certificate of appealability as to six claims and parts of a seventh. On appeal, however, Williams makes only two claims: (1) the videotape of his custodial interrogation was admitted at trial in violation of *Miranda v. Arizona*, 384 U.S. 436 (1966), and *Edwards v. Arizona*, 451 U.S. 477 (1981); and (2) he received ineffective assistance of counsel during the mitigation phase of his trial in violation of

*Strickland v. Washington,* 466 U.S. 668 (1984). Because the Ohio courts did not unreasonably apply clearly established federal law, we **AFFIRM**.

## I. Background

The facts of this case, as described by the Ohio Supreme Court, are as follows:

On the evening of February 17, 1999, Troy Presnell and Williams were visiting at the home of Presnell's mother, who lived in Apartment 3 at Glendale Terrace. Williams and Presnell left in order to panhandle, and then they drank and shot pool at a local bar. Presnell paid for the drinks because he thought Williams had no money.

Around 12:00 a.m., February 18, Williams and Presnell returned to Apartment 3 at Glendale Terrace. Shortly thereafter Williams left again. Wanda Richards, who also lived at Glendale Terrace, saw Williams leave Apartment 3 around 12:00 a.m. When Williams came out, he looked at Richards, who was in a wheelchair, and asked her if she was watching him walk up and down the hall. After Richards replied that she was on her way home, Williams offered to "push [her] home." Richards declined, stating that she had to go home quickly and call a friend or someone would come looking for her.

Around 12:20 a.m., Williams came back to Apartment 3 and showed Presnell between $400 and $500, which he shared with Presnell. When he did so, Williams remarked, "This is how you panhandle." The next day, Williams told Presnell that he had bought a car.

That morning, around 9:00, February 18, Shirley Green, Velma's[1] younger sister, discovered Velma's body in Velma's apartment. She was lying on the bed sideways. Her body was naked, and her legs were spread. Green, the police, and emergency medical personnel initially believed that Velma had died of natural causes. Green noticed that the door to Velma's apartment was locked, which was unusual because Velma normally kept that door unlocked. Velma's purse was in the apartment and had $1,100 in it.

Later that same morning, Dr. Diane Scala-Barnett, deputy coroner, examined Velma's body, concluded that she was a homicide victim, and notified police. Dr. Scala-Barnett observed bruises on Velma's eye, ear, left cheek, mouth, jaw, wrist, left breast, and foot. Dr. Scala-Barnett found bruises on Velma's vagina, which was filled with blood.

---

[1] The Ohio Supreme Court consistently referred to McDowell by her first name, and we preserve that practice when quoting the court's opinion. We intend no disrespect to the deceased.

Dr. Scala-Barnett also found that a cloth had been stuffed into Velma's mouth. Dr. Scala-Barnett noted that one would not voluntarily stuff a rag into one's own mouth. Dr. Scala-Barnett found a human hair on the rag that was later determined to be a "Negroid pubic hair." Velma was a Caucasian. Dr. Scala-Barnett concluded that the rag did not cause Velma to suffocate; instead, she "died of asphyxia due to ligature strangulation." The strangulation marks were consistent with having been caused by a bloodied pair of women's hose found inside the entrance to Velma's apartment.

When police officers examined Velma's apartment that afternoon, they found no signs of forced entry; however, detectives discovered a latent palm print and a fingerprint identified as Williams's in the hallway and on the molding of the entry door leading into Velma's apartment.

In Velma's bedroom, forensic technicians found Velma's blood on the carpet beside her bed and on a bed pillow. Technicians found other stains on Velma's bed, on the rug beside the bed, and on a tissue found in the bathroom. These stains fluoresced under alternate lighting, indicating the presence of a bodily fluid, i.e., semen. On the basis of an initial DNA test, an expert concluded that the DNA type found in the semen stains matched Williams's DNA and occurs in one of 90,100 Caucasians, one of 5,680 African-Americans, and 1 of 22,200 Hispanics. Another DNA expert, who conducted more sophisticated DNA tests, testified that the DNA in the semen from Velma's apartment, identical to Williams's DNA, was found in only one of 5.4 quadrillion Caucasians and one of 156 quadrillion African-Americans.

On the morning of February 22, police went to the home of Williams's ex-wife to question him about Velma's death. When the police car drove up, Williams ran away. Police Sergeant Steve Forrester chased him on foot for 30 minutes. At one point, Forrester drew his weapon and cornered Williams, who responded, "Fuck it, just shoot me." Williams then evaded Forrester, but two uniformed police officers later apprehended him.

*State v. Williams*, 793 N.E.2d 446, 454–55 (Ohio 2003) (alteration removed) (hereinafter

"*Williams II*").

In addition to the 30-minute foot chase, Williams's arrest was unusual for another reason:

At the scene of the arrest, Alan Penamon, an attorney, approached Sgt. Forrester and told him that he was an attorney. Penamon also told Forrester, "I don't want you to take a statement from [Williams] until I talk with him." Forrester replied that it was up to Williams to invoke his *Miranda* rights, but police did not question Williams at the scene.

*Id.* at 456 (alteration in original) (footnote omitted).[2] Further, Penamon was informed that "if he needed to talk to Williams, they were going to take [Williams] to the station." *Id.* at 457. Meanwhile, Williams "was screaming, cursing, and struggling to get free." *Id.* at 456. Among other things, Williams yelled, "Allen" and "that's my attorney Allen." *Id.*

Despite this, detectives eventually interrogated Williams without Penamon's involvement. As the Ohio Supreme Court explained:

> After police had taken Williams to the police station, Penamon went to the visitors' area at the police station and asked to talk with Williams. Neither Lt. Hunt nor Sgt. Forrester, the responsible officers at the station, immediately responded. Lt. Hunt stated that approximately 10 to 15 minutes after he knew that Penamon was there, he went to see what Penamon wanted. But Penamon had already left. Also, when Forrester went to see Penamon at the visitors' area, Penamon had already left. The evidence does not indicate that police told Williams that Penamon had come to the station and had asked to talk with him.
>
> At the station, Detectives Bart Beavers and Mauro advised Williams of his *Miranda* rights. Williams orally waived his rights and signed a waiver of those rights at 8:50 a.m. Williams did not ask to see Penamon or any other lawyer, decline to answer questions, or invoke his right to remain silent. At the beginning of the interview, Williams asked why the police had chased away his lawyer when he was arrested on the street. Detective Mauro responded that they would not discuss the case on the street and that Penamon was informed that if he needed to talk to Williams, they were going to take him to the station. . . .

*Id.* at 457. Further, in the course of this conversation, Williams confirmed his understanding of his *Miranda* rights by stating "[a]t any time I can stop," and his willingness to continue by stating "I'm gonna talk to you." (Video, State's Trial Ex. 92 at 8:48-8:50 a.m.)

This interview eventually provided substantial evidence of Williams's guilt:

> For 30 to 40 minutes, Williams described his activities on February 17 and 18 and denied that he was involved in Velma's death.

---

[2] Penamon's first name is properly spelled "Alan," but it also appears in the record as "Allan" and "Allen." *Williams II*, 793 N.E.2d at 456 n.1.

The police paused the interview and took photographs of a cut on Williams's hand, possibly caused by stuffing the rag down Velma's throat. After these photographs were taken, Police Lieutenant Charles Hunt, who had not previously interviewed Williams, questioned Williams. Lt. Hunt told Williams that the police knew that he was guilty, that he was going to be charged with murder, that police had found his fingerprints and semen in Velma's apartment, and that witnesses had seen Williams flashing money that he did not have before. When confronted with these facts, Williams responded, "I told her not to put that rag in her mouth."

Williams asserted to police that he and Velma voluntarily had sex three or four times over the previous two weeks. Williams claimed that on the night that she died, he stopped by her apartment, and she invited him in and asked him if he wanted to have sex with her. According to Williams, Velma placed the cloth rag over her mouth while they were having sex to muffle her sounds of pleasure and screaming. When Williams noticed that she was gagging, he panicked and left the apartment.

Then, Lt. Hunt confronted Williams with the fact that Velma had not choked to death but was strangled. In response, Williams stated that he had returned to the apartment and strangled Velma with a pair of pantyhose to make it appear as if a stranger had killed her. Williams continued to deny that he had stuffed the cloth in her mouth. He admitted, however, that he had ejaculated on the floor near her bed and that he had taken $300 from her purse.

*Williams II*, 793 N.E.2d at 455.

Further, Williams later made additional inculpatory statements:

That afternoon, Williams was booked into the Lucas County Jail, where a nurse obtained a blood and a DNA sample from him. While the nurse took the blood sample, Williams "made a couple of statements to himself." Williams stated, "My dick got me in trouble" and "I ought to cut it off." Shortly thereafter, Williams said, "I guess I won't be screwing any more old ladies." At the time, no police officers were questioning Williams. He blurted out these statements on his own volition and to no one in particular.

*Id.* at 456.

## II. Procedural History

### A. Pre-trial Proceedings

Following Williams's arrest, he was indicted for aggravated felony-murder, rape, and aggravated burglary. *Williams II*, 793 N.E.2d at 456. The murder charge included three death

penalty specifications: murder during rape, murder during aggravated robbery, and murder during a burglary. *Id.* Two issues that arose before trial are relevant to this appeal.

First, Williams moved to suppress the statements he made to police during his videotaped interview on the grounds that the police had violated his right to have the assistance of counsel during custodial interrogation. The state trial court held a suppression hearing. Penamon was present at the hearing. But defense counsel decided not to call Penamon as a witness after the court stated its view that doing so would waive the attorney-client privilege. Based on the evidence that *was* presented—testimony from the officers involved in Williams's arrest and interrogation, the *Miranda* waiver form, and excerpts of the videotape of the interrogation—the state trial court denied Williams's motion to suppress, finding that Williams had not invoked his *Miranda* right to counsel, and, further, that Williams's waiver of his *Miranda* rights was valid.

Second, in the month prior to Williams's August 9, 1999, trial date, the state trial court held a series of pretrial hearings to address the possibility of a continuance. The issue arose primarily because the prosecution had recently received, and then disclosed to defense counsel, extensive documentation related to Williams's prior adult and juvenile offenses, his family background, and his mental health history.

On July 16, 1999, defense counsel told the court they had advised Williams that they were "of the professional opinion that some more time [wa]s needed to delve into" that evidence, but that Williams "d[id] not agree," and "wishe[d] to proceed on [August] 9th." (Pretrial Hr'g Tr., R. 18, Vol. 1, Jul. 16, 1999 at 3.) For its part, the prosecution informed the court that it did not object to a reasonable continuance, but that if Williams insisted on going to trial on August 9, that decision should operate as a waiver of the opportunity to further investigate issues raised by the newly-disclosed evidence. In response to a question from the court, defense counsel then

clarified that Williams "want[ed] to go the 9th even over our strong recommendation against" doing so. (*Id.* at 10.) And the prosecution further clarified its position that "what we are most concerned about" was "mak[ing] sure this man has a fair trial" and "that he gets all the mitigation preparation time he needs." (*Id.* at 11.)

The court then inquired of Williams, and learned that Williams was deeply dissatisfied with the course of the proceedings. Williams acknowledged his attorneys' advice that the trial should be delayed. But he also repeatedly found fault with his attorneys' performance, challenged the court's prior ruling not to suppress his videotaped interview, implied that his attorneys and the court were collaborating with the prosecution, and asserted that, as a black man, he would not receive a fair trial. In particular, Williams stated that he did not "want to have these lawyers," and requested the court assign him new counsel. (*Id.* at 16–17.)

The court, after discussing these complaints with Williams, the prosecutor, and defense counsel, informed Williams that it would grant his request for new defense counsel, "with the understanding that that is going to result in the continuance of the trial" and "that will constitute a waiver of your speedy trial rights." (*Id.* at 36–37.) Williams, however, refused to agree and continued to oppose the idea of delaying his trial for any reason. The court then asked Williams directly whether he wanted to keep his current counsel. Williams responded: "Yeah, I'm going to die anyway might as well keep them." (*Id.* at 39.)

After an off-the-record conference with counsel, the court recessed to allow defense counsel to confer with Williams. When the hearing resumed, defense counsel informed the court that "Mr. Williams ha[d] vacilated between" wanting to keep his present counsel and wanting new counsel. (*Id.* at 40.) Defense counsel therefore requested a continuance of a few days to consult with an ethics official from the local bar association regarding whether they could

continue to represent Williams under the circumstances, particularly given the accusations of inadequate performance. The court granted that request.

The pretrial hearing resumed on July 19. Defense counsel told the court that they had been advised that the applicable ethics rules did not prohibit them from continuing to represent Williams. However, defense counsel asked the court to inquire of Williams to confirm that Williams was satisfied with them. The court then asked Williams whether he wanted to keep his present counsel, and Williams answered: "Yes." (Pretrial Hr'g Tr., R. 18, Vol. 1, Jul. 19, 1999 at 4.) In response to further questions, Williams also clarified he was sufficiently satisfied with his attorneys' performance to have them continue to represent him, and that he was withdrawing his request for new counsel. Williams was not willing, however, to decide whether to waive his speedy trial rights and continue the trial date, or to proceed on August 9. Defense counsel therefore requested, and the trial court granted, another continuance of the pretrial hearing.

The parties were back in court on July 23. Defense counsel opened by informing the court that they had advised Williams "to continue the case so we can constitutionally give him [an] effective defense," but that Williams "wish[ed] to go on August 9th." (Pretrial Hr'g Tr., R. 18, Vol. 1, Jul. 23, 1999 at 3.) The court then asked defense counsel directly: "[I]f this matter proceeded to trial August 9th, would you . . . be prepared and able to provide effective assistance of counsel to Mr. Williams?" (*Id.* at 4.) Counsel responded:

> [C]an we be prepared? Yes. Do we want more time? Yes. We could do a better job, we believe, but we believe we would be within the bounds of giving effective counsel. It's just that our legal decision would be to get further time to just to be able to prepare more.

(*Id.* at 4.) Prompted by the prosecution, the court then asked: "You are looking for more time for developing additional mitigation efforts?" (*Id.* at 5.) Defense counsel answered: "Yes." (*Id.* at 5.)

The following dialogue then took place:

THE COURT:          And Mr. Williams . . . have you discussed with your attorneys . . . their request and suggestions that the case be continued so that they can have further time available for preparation?

THE DEFENDANT:   Yes.

THE COURT:          And have they explained to you their reasons for seeking a continuance[?]

THE DEFENDANT:   Yes.

THE COURT:          Okay.  And from what they've explained to me[,] and we've discussed this a little bit last week as well, do you feel that you do not wish to continue this case and proceed on August 9th?

THE DEFENDANT:   Yes.

THE COURT:          Okay.  Do you understand your attorneys' concerns about having more time for preparation and I guess it's specifically for any mitigation phase of the trial, if that's necessary?

THE DEFENDANT:   Yes.

THE COURT:          And understanding that and discussing it with your attorneys it's your desire not to follow their advice and to not consent to a continuance of the trial, is that right?

THE DEFENDANT:   Say that again, please?

THE COURT:          Okay, let me say it again.  You understand their reasons for requesting a continuance of the trial, is that right?

THE DEFENDANT:   Yes.

THE COURT:          Okay.  And understanding why they want to proceed with a continuance, it's your desire and your decision not to continue the case?

THE DEFENDANT:   Yes.

THE COURT:          And you want your attorneys to try the case on August 9th, and not have the matter continued to a later date, is that right?

THE DEFENDANT:   Yes.

. . .

THE COURT:          I want to make sure it's clear on the record that you do not want more time and you want this trial to proceed on August 9th, that's what you want, right?

THE DEFENDANT:   Yes.

THE COURT:          Then, I will indicate for the record, that I've discussed this with Mr. Williams, and at his decision and despite the advice of his attorneys, this matter will proceed to trial on August 9th, and I expect both the State of Ohio and the defense to be ready on that day.

(*Id.* at 9–10.)

## B. Trial

As he requested, Williams's trial began on August 9, 1999. The prosecution presented witness testimony regarding Williams's activities before and after McDowell's death; the forensic evidence recovered from McDowell's apartment; photographs of the scene, including of McDowell's body; the videotape of Williams's interview by detectives; and testimony regarding Williams's impromptu statements during booking that "[m]y dick got me in trouble," and "I guess I won't be screwing any more old ladies." *See Williams II*, 793 N.E.2d at 454–56. The only evidence offered by the defense was testimony confirming that police did not secure the crime scene for several hours because they originally thought McDowell had died of natural causes. *Id.* at 456. The jury found Williams guilty on all counts, and also found all three death-penalty specifications applicable. *See id.*

The penalty-phase hearing was relatively brief. With the jury having already found that Williams had murdered McDowell while committing rape, aggravated robbery, and aggravated burglary, the prosecution simply reintroduced its trial exhibits, and presented no additional evidence.

Williams began by presenting testimony from his two sisters, each of whom testified as to Williams's extremely troubled childhood and the beatings and other physical abuse he suffered, particularly at his mother's hands. He also presented testimony from his mother, who emphasized that Williams's father had been a negative influence when present at all, and that Williams had grown up without a positive male role model. She also acknowledged that she sometimes beat Williams when he was a child.

Williams then called his retained expert, clinical psychologist Christopher Layne, Ph.D. Dr. Layne had met with Williams twice, administered various tests, reviewed certain of Williams's medical and mental health records, and interviewed one of Williams's sisters. "Dr. Layne described Williams's dysfunctional family, his irresponsible parents, the abuse heaped upon him as a child, his chaotic upbringing, and his mental and emotional problems, such as paranoia and 'psychotic like' symptoms." *Williams II*, 793 N.E.2d at 468. Dr. Layne also "testified that if Williams had received proper discipline, counseling, and psychiatric treatment as he was growing up, 'the probability would be low that we would be sitting here.'" *Id.* (alteration removed).

Dr. Layne's testimony, however, may have done more harm to Williams than good. Dr. Layne testified that, despite multiple head injuries, Williams had not suffered brain damage. And his description of Williams was stark. Dr. Layne testified that, by age 16, Williams was "a guy that could [not] care less who[m] he hurt or what he d[id]," and who had "calcif[ied] into

basically a bad person." (Mitigation Hr'g Tr., R. 18, Vol. 10, at 83–84, 99.) Defense counsel

asked: "what is Robert today?" Dr. Layne answered: "Well, I think that today he is a hardened

gutless criminal." (*Id.* at 100.) Further,

> [d]uring cross-examination, Dr. Layne disclosed that Williams had committed various sex offenses when he was 12 to 16 years old. He assaulted boys and girls in his neighborhood as well as one of his sisters. He had spent more than a decade in institutions for criminals, and does not take responsibility for anything he does.

*Williams II*, 793 N.E.2d at 472. When asked what could be done to treat Williams, Dr. Layne

told the jury: "I don't think there is anything we can do," and that "treatment, counseling is

probably a waste of time now," but that Williams would become less dangerous with age.

(Mitigation Hr'g Tr., R. 18, Vol. 10 at 101–02, 111–12.)

Finally, Williams made an unsworn statement to the jury, saying that he did not really

remember the night of McDowell's death, but that he was sorry about what had happened.

*Williams II*, 793 N.E.2d at 472.

The jury recommended the death penalty. The trial court sentenced Williams to death

on the aggravated felony-murder count and to consecutive prison terms of ten years each on

the remaining counts. *Id.* at 454–56.

### C. Subsequent State Proceedings

Williams's direct appeal and state postconviction proceedings took place concurrently.

In postconviction proceedings, Williams petitioned for relief on 14 separate grounds, including

both the *Miranda*/*Edwards* and *Strickland* issues presented in this appeal. The state trial court

denied relief and, as relevant here, that decision was affirmed by the Ohio Court of Appeals

in 2002. *State v. Williams*, 777 N.E.2d 892 (Ohio App. 2002) (hereinafter "*Williams I*").[3]

The Supreme Court of Ohio denied review, *State v. Williams*, 839 N.E.2d 403 (Ohio 2003) (mem.), and the United States Supreme Court denied certiorari, *Williams v. Ohio*, 541 U.S. 963 (2004) (mem.). Meanwhile, on direct appeal, Williams raised 20 different issues directly with the Ohio Supreme Court. *See* Ohio Rev. Code § 2929.05(A). In 2003, the court denied relief on all of those claims, and also independently found the death sentence appropriate. *Williams II*, 793 N.E.2d at 456–73. Certiorari was not sought.

## 1. The *Miranda* and *Edwards* Claims

Williams raised his *Miranda* and *Edwards* claims—that he was improperly denied access to counsel during his custodial interrogation—both on direct appeal and in state postconviction proceedings. The state postconviction trial court reached the issue first, and held that Williams's *Miranda* and *Edwards* claims were barred by Ohio's doctrine of res judicata. The state postconviction court of appeals agreed. *Williams I*, 777 N.E.2d at 897–98 (citing *State v. Perry*, 226 N.E.2d 104 (Ohio 1967)). The appellate court also found Williams's attempt to support his claims with a postconviction affidavit from Penamon unavailing. *Id.* at 898. The court explained that the information in Penamon's affidavit had been available to defense counsel at the time of the suppression hearing, that "trial counsel decided not to call attorney Penamon for tactical reasons," and, therefore, "the issue of

---

[3] The state appellate court did remand for further fact-finding on Williams's claim that his rights were violated because court personnel were inappropriately involved in a group prayer with the jurors. *Id.* at 899–901. The state trial court subsequently heard evidence on that claim and denied relief, the Court of Appeals of Ohio affirmed, and the Supreme Court of Ohio denied review. *State v. Williams*, 839 N.E.2d 403 (Ohio 2005) (table); *State v. Williams*, 832 N.E.2d 783 (Ohio App. 2005). Williams repeated this claim in his federal habeas petition, but the district court denied relief and declined to grant a certificate of appealability on that claim. Williams did not seek to expand the certificate of appealability, so the jury-prayer issue is not before this court.

which appellant complains was or could have been raised at trial or on direct appeal and is, therefore, properly the subject of the application of the doctrine of res judicata." *Id.* Thus, the state postconviction courts did not reach the merits of the *Miranda/Edwards* claims.

One year later, however, the Supreme Court of Ohio addressed the merits of the *Miranda* and *Edwards* claims on direct appeal. *See Williams II*, 793 N.E.2d at 456–60. The court denied those claims, holding that Williams had not unambiguously invoked his right to counsel, that he had validly waived that right, and that the admission of the videotaped interview was, in any case, harmless, because other "compelling evidence established Williams's guilt." *Id.*

## 2. The *Strickland* Claims

Williams asserted violations of his Sixth Amendment right to the effective assistance of counsel during the mitigation phase of his trial both on direct appeal and in the postconviction proceedings, but the bases for his claims were slightly different.

On direct appeal, being limited to the trial record, Williams argued that the decision to call Dr. Layne "provided no useful defense evidence and affirmatively damaged the case for a life sentence." *Williams II*, 793 N.E.2d at 467. The Ohio Supreme Court denied that claim on the merits, reasoning that "[t]he decision to call Dr. Layne represented a reasonable professional judgment based on the theory that if jurors knew Williams's background and history, and how and why he developed into the person that he was, they would be less likely to recommend death." *Id.* at 468. The court also held that "Williams has not established prejudice," because omitting Dr. Layne's testimony would not have created "a reasonable probability . . . that the result of the trial would have been different." *Id.* (citation omitted).

In postconviction proceedings, Williams expanded his *Strickland* claim. Williams argued that his attorneys were ineffective during the mitigation phase because: (1) they failed to adequately investigate, prepare, and present available mitigating evidence related to the sexual abuse Williams suffered as a child; (2) they failed to present an expert who was qualified and able to address issues specific to sex offenders; (3) they presented an incompetent expert—Dr. Layne; and (4) they failed to secure and review Williams's prior prison records, which Williams claimed showed he had previously adjusted well to prison life. Williams submitted new evidence in support of those claims.

Williams offered an affidavit from Dorian L. Hall, the supervisor of the mitigation section of the Office of the Ohio Public Defender. Hall averred that Williams's trial counsel contacted him in "early July 1999" for assistance preparing the mitigation portion of Williams's defense. (Hall Aff., R. 16, Vol. 8 at 178.) Hall then attended the July 16, 1999, pretrial conference. Hall advised defense counsel that his office could not provide mitigation services unless the trial was continued. As discussed above, the trial remained set for August 9 solely on Williams's insistence. *See* discussion *supra* Section II.A. Despite that, Hall and his staff researched potential mitigation strategies and mailed "the collected research material, comments from staff, suggestions for witnesses and contacts for additional information" to defense counsel on July 27. (Hall Aff., R. 16, Vol. 8 at 180.) Among other ideas, Hall "suggested that given the facts of the crime and Mr. Williams's juvenile history, the psychological expert needed to address Mr. Williams' history of sexual offenses and the sexual nature of the current offense . . . as well as explain Mr. Williams' behavior in light of his history." (*Id.*) Hall's staff also reviewed the available records regarding Williams's mental health history, "detail[ed] the contacts with professionals" so that defense counsel could follow up with the clinicians who had

examined or treated Williams, and suggested additional records to acquire and review. (*Id*. at 179.) This information was faxed to counsel on August 2.

Williams submitted a lengthy new expert report from psychologist Allen J. Brown, Ph.D. *Williams I*, 777 N.E.2d at 896. Dr. Brown concluded that Dr. Layne had made numerous errors in his evaluation of Williams and his testimony at trial. According to Dr. Brown, Dr. Layne had misinterpreted many of Williams's prior test results, based his conclusions on outdated ideas about criminal behavior, and offered opinions based not on psychological knowledge but on personal beliefs and prejudices. Most importantly, Dr. Brown concluded that Williams does suffer from neurological impairment.

Williams also submitted records from his prior terms of imprisonment. However, he did not submit affidavits from either of the attorneys who had represented him at trial.

After considering Williams's evidence and arguments, the postconviction trial court denied the ineffective assistance claims, finding that Williams had shown neither deficient performance nor prejudice. The state appellate court affirmed. Considering all the mitigation-phase ineffective assistance claims together, the court concluded that Williams sought to

> use Dr. Brown's report to build an alternative theory of mitigation that explain[ed] [Williams]'s deviant sexual behavior. [Williams] then s[ought] to fault trial counsel for failure to embrace this theory and insist[ed] that trial counsel's performance was deficient for failing to present evidence in support of this theory and in not choosing an expert versed in sexual deviance.

*Williams I*, 777 N.E.2d at 897. But, the court found, "[a] dispute between experts alone does not show ineffective assistance of trial counsel for failing to present an alternative view." *Id.* at 896. Further, given the deference owed to counsel's strategic choices, the court "c[ould not] say that the mitigation theory that trial counsel used, 'that appellant fell

between the cracks,' was not sound strategy." *Id.* at 896–97 (citations omitted). The court therefore concluded that Williams had failed to show that his counsel's performance was deficient. *Id.* at 897. The court did not reach the prejudice prong of the *Strickland* inquiry. *See id.* at 896–97.

### D. Federal Habeas Proceedings

Williams filed his federal habeas corpus petition in 2006, raising 19 claims. The petition was fully briefed by May 2007. Williams sought discovery to support his claims that same month, and Respondent opposed that request. Williams's discovery request remained pending until April 2011, when Respondent advised the district court of the Supreme Court's intervening decision in *Cullen v. Pinholster*, 563 U.S. 170 (2011).[4] The district court directed the parties to brief the impact of *Pinholster*. They did so, and in December 2012 the district court denied Williams's request for discovery without prejudice, deciding that, in light of *Pinholster*, it would reconsider the request if it later found that Williams had met his burden under 28 U.S.C. § 2254(d). A year later, in September 2013, the district court denied Williams's habeas petition and dismissed the action, but certified for appeal Claims 1, 2, 7, 12, 13, 14, and some of Claim 11's subclaims. Williams timely appealed. Williams did not seek to expand the certificate of appealability.

### III. Claims on Appeal

On appeal, Williams argues that his federal rights were violated when the videotape of his uncounseled custodial interrogation was played for the jury (Claims 1 and 2) and because he

---

[4] The record contains no explanation as to why the case sat dormant for nearly four years.

did not receive effective assistance of counsel during the penalty phase of this trial (Claims 12, 13, and 14).[5]

## A. Standard of Review

In the habeas context, we review de novo the district court's legal conclusions and its answers to mixed questions of fact and law. *Lucas v. O'Dea*, 179 F.3d 412, 416 (6th Cir. 1999) (citing *Fair v. United States*, 157 F.3d 427, 430 (6th Cir. 1998)). The district court's independent findings of fact are reviewed for clear error, *id.*, but findings based only on the district court's reading of the state court record are reviewed de novo, *Slagle v. Bagley*, 457 F.3d 501, 513 (6th Cir. 2006).

Williams filed his federal petition after the effective date of the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 110 Stat. 1214 (AEDPA), so AEDPA standards govern our review. *See Lindh v. Murphy*, 521 U.S. 320, 326–27 (1997). Under AEDPA,

> a federal court may not grant a writ of habeas corpus with respect to any claim adjudicated on the merits in state court unless the state adjudication: (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

---

[5] Williams did not address Claim 7 (jury instructions and unanimity) or any of the certified subclaims from Claim 11 (guilt-phase ineffective assistance of counsel) in his briefs. He has therefore abandoned those claims. *See Robinson v. Jones*, 142 F.3d 905, 906 (6th Cir. 1998). Meanwhile, in contrast to the proceedings below, on appeal Respondent does not assert that the alleged *Miranda/Edwards* violations were harmless. Respondent has therefore abandoned that argument. *See id.* at 906.

*Cauthern v. Colson*, 736 F.3d 465, 473 (6th Cir. 2013) (quoting 28 U.S.C. § 2254(d)). The petitioner carries the burden of proving that this standard has been met. *Pinholster*, 563 U.S. at 181.

> It is well-established that:

> [i]n analyzing whether a state court decision is contrary to or an unreasonable application of clearly established Supreme Court precedent, a federal court may look only to the holdings of the Supreme Court's decisions, not the dicta. A state court decision on the merits is contrary to clearly established Supreme Court precedent only if the reasoning or the result of the decision contradicts that precedent.

*LaMar v. Houk*, 798 F.3d 405, 415 (6th Cir. 2015) (citations omitted). And it is equally well-understood that:

> [t]o violate the unreasonable-application clause, after identifying the correct governing legal principle from the Supreme Court's decisions, the state court decision must (a) unreasonably apply it to the facts, or (b) either unreasonably extend or unreasonably refuse to extend a legal principle from Supreme Court precedent to a new context. The state-court application of Supreme Court precedent must have been "objectively unreasonable," not simply erroneous or incorrect.

*Id.* (citations omitted).

Finally, we review "the last reasoned state court decision," *Cauthern*, 736 F.3d at 473 (citing *Pinholster*, 563 U.S. at 187–88), and "[s]tate-court factual findings are presumed correct unless the applicant rebuts them by clear and convincing evidence," *LaMar*, 798 F.3d. at 415 (citing 28 U.S.C. § 2254(e)(1)).

### B. *Miranda* and *Edwards* Claims

Williams claims that the videotape of his interview by police was improperly admitted into evidence, and that it was an unreasonable application of Supreme Court precedent for the Ohio courts to decide otherwise. We disagree.

1. Applicable Law

Before a defendant may be subjected to custodial interrogation:

> He must be warned . . . that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him . . . . Opportunity to exercise these rights must be afforded to him throughout the interrogation. After such warnings have been given, and such opportunity afforded him, the individual may knowingly and intelligently waive these rights and agree to answer questions or make a statement. But unless and until such warnings and waiver are demonstrated by the prosecution at trial, no evidence obtained as a result of interrogation can be used against him.

*Miranda*, 384 U.S. at 479. And the Supreme Court has held that once a suspect invokes his *Miranda* right to counsel, he may not be "subject to further interrogation" unless he "initiates further communication . . . with the police." *Edwards*, 451 U.S. at 484–85.

To effectively invoke the right to counsel and trigger the *Miranda/Edwards* protections, "the suspect must unambiguously request counsel." *Davis v. United States*, 512 U.S. 452, 459 (1994). Whether a suspect has done so "is an objective inquiry." *Id.* at 458–59 (citing *Connecticut v. Barrett*, 479 U.S. 523, 529 (1987)). Thus, the suspect must "articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." *Id.* at 459. If a suspect's statement "fails to meet the requisite level of clarity, *Edwards* does not require that the officers stop questioning the suspect." *Id.* (citing *Moran v. Burbine*, 475 U.S. 412, 433, n.4 (1986)). Moreover, not just any reference to an attorney suffices. Interrogation must cease only

> when the suspect "has expressed" his wish for the particular sort of lawyerly assistance that is the subject of *Miranda*. It requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney in dealing with custodial interrogation by the police.

*McNeil v. Wisconsin*, 501 U.S. 171, 178 (1991) (quoting *Edwards*, 451 U.S. at 484) (emphasis omitted); *see also Barrett*, 479 U.S. at 528–29 (holding that the defendant's statement that he was willing to speak with police about the incident in question but would not make a written statement without the assistance of counsel did not preclude the police from questioning the defendant).

Further, a suspect may waive his *Miranda* rights, "provided the waiver is made voluntarily, knowingly and intelligently." *Miranda*, 384 U.S. at 444. A *Miranda* waiver inquiry

> has two distinct dimensions. First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the "totality of the circumstances surrounding the interrogation" reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived.

*Moran*, 475 U.S. at 421 (citations omitted). As we have said previously:

> [t]he relevant question is not whether the "criminal suspect knew and understood every possible consequence of a waiver of the Fifth Amendment privilege," but rather whether the "suspect knew that he could choose not to talk to law enforcement officers, to talk only with counsel present, or to discontinue talking at any time."

*Garner v. Mitchell*, 557 F.3d 257, 261 (6th Cir. 2009) (en banc) (quoting *Colorado v. Spring*, 479 U.S. 564, 574 (1987)). Whether a waiver was "knowing and intelligent" is determined based on the "totality of the circumstances," and the burden is on the defendant to establish that his waiver was invalid. *Id.* at 260–61 (citing *Clark v. Mitchell*, 425 F.3d 270, 283 (6th Cir. 2005)).

2. Williams's Statements at the Time of His Arrest

Williams asserts that he made an unambiguous request for counsel during his arrest. But the testimony at the suppression hearing established only that Williams yelled attorney Alan Penamon's name and "that's my attorney." (Suppression Hr'g Tr., R. 18, Vol. 1 at 38.) Given the record before it, the Ohio Supreme Court concluded that "Williams never specifically asked to see Penamon, and we do not know why he shouted his name." *Williams II*, 793 N.E.2d at 445. That was not "an unreasonable determination of the facts in light of the evidence presented in the state court proceeding," 28 U.S.C. § 2254(d)(2), particularly since Williams might have called out for any number of reasons, including for Penamon's help with bail. And since Williams "never specifically asked to see Penamon," *Williams II*, 793 N.E.2d at 445, it follows that it was not unreasonable for the Ohio Supreme Court to conclude that Williams did not "unambiguously request" the assistance of counsel at the time of his arrest, *Davis*, 512 U.S. at 459; *Williams II*, 793 N.E.2d at 445.

Our decision in *Abela v. Martin*, 380 F.3d 915 (6th Cir. 2004), cited by Williams, is distinguishable. In *Abela*, the suspect was subjected to custodial interrogation in his hospital bed when he said "maybe I should talk to an attorney by the name of William Evans," then "showed [the police officer] Evans's business card." *Id.* at 919. The officer "said he would call [the suspect]'s attorney for him and left the room presumably to do so." *Id.* at 926. But the officer nevertheless returned and questioned the suspect without the suspect's attorney present. *Id.* at 919. We concluded that: "[the officer]'s actions confirm that a reasonable officer would understand [the suspect]'s statement to be a clear request for counsel" and granted habeas relief. *Id.* at 926–27. By contrast, there is no evidence here that police actually understood Williams's shouted references to Penamon to be a request for the assistance of counsel, and thus nothing in

*Abela* convinces us that the Ohio Supreme Court unreasonably applied the Supreme Court's precedent in this case.

That alone is enough to resolve the *Miranda/Edwards* claims arising out of Williams's arrest. However, because this is a capital case, we think it appropriate to address additional arguments raised by the parties.

Williams argues that we should consider Penamon's postconviction affidavit because it was "part of the record in front of the Ohio Supreme Court." (Reply Br. at 20.) That is true of Williams's *postconviction* appeal, but not of his *direct* appeal. And AEDPA's plain language limits our review to "the evidence presented in the State court *proceeding*." 28 U.S.C. § 2254(d)(2) (emphasis added). Contrary to Williams's assertion, nothing in *Pinholster* supports the proposition that a federal court reviewing a state court's decision in one case may consider evidence that was before the state court in a second case, even if that second case involves the same defendant. Rather, federal habeas review "is limited to the record that was before the state court that *adjudicated the claim on the merits*." *Pinholster*, 563 U.S. at 181 (emphasis added). The Ohio Supreme Court's decision on direct appeal is the proceeding in which Williams's *Miranda* claims were adjudicated on the merits, so our review is limited to the record in that case.

However, even if we were to consider Penamon's postconviction affidavit, it would not change our conclusion that the Ohio Supreme Court did not unreasonably apply federal law. Penamon's affidavit asserts that "[Williams] was yelling to me and identifying me as his attorney. [Williams] explicitly indicated that he wanted to talk to me." (Penamon Aff., R. 16, Vol. 8 at 189.) Assuming Williams did ask to speak to Penamon at the time of his arrest, it is not

clear that this would suffice to validly invoke his *Miranda* right to counsel.[6]   A suspect's *Miranda* rights only attach when he is both "in custody" and "subject[] to interrogation." *Miranda*, 384 U.S. at 467.  Williams was certainly in custody when he called out to Penamon. *Berkemer v. McCarty*, 468 U.S. 420, 434 (1984) ("There can be no question that respondent was 'in custody' at least as of the moment he was formally placed under arrest and instructed to get into the police car.").  It is equally certain, however, that Williams was not being interrogated at that point, because he was not "subjected to either express questioning or its functional equivalent." *Rhode Island v. Innis*, 446 U.S. 291, 300–01 (1980).  And Respondent correctly points out that the Supreme Court has "never held that a person can invoke his *Miranda* rights anticipatorily, in a context other than custodial interrogation." *McNeil*, 501 U.S. at 182 n.3 (citations omitted).

Williams addresses this problem by arguing that "[p]ost-*McNeil*, federal circuit courts have held that the right to counsel attaches once interrogation is imminent." (Appellant's Br. at 30.)  But what matters is whether the state court unreasonably applied clearly established Federal law "as determined by the Supreme Court." 28 U.S.C. § 2254(d)(1).

> Section 2254(d)(1) provides a remedy for instances in which a state court unreasonably *applies* this Court's precedent; it does not require state courts to *extend* that precedent or license federal courts to treat the failure to do so as error. Thus, "if a habeas court must extend a rationale before it can apply to the facts at hand," then by definition the rationale was not "clearly established at the time of the state-court decision."

---

[6]   The Ohio Supreme Court did not address this issue, but "[i]n assessing the reasonableness of the state court's application of federal law," we "review the *result* that the state court reached, not whether its decision was well reasoned." *Holland v. Rivard*, 800 F.3d 224, 235–36 (6th Cir. 2015) (quoting *Robinson v. Polk*, 438 F.3d 350, 358 (4th Cir. 2006)) (emphasis in *Robinson*) (brackets omitted).

*White v. Woodall*, 134 S. Ct. 1697, 1706 (2014) (emphasis in original) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 666 (2004)) (other citation omitted).

Several days before his arrest, a detective spoke to Williams by phone and asked him to come to the station to answer questions about McDowell's murder. Thus, Williams's assertion that his interrogation was imminent as soon as he was arrested is not unreasonable. However, Williams's interrogation did not begin immediately upon his arrest on a Toledo street; it began approximately one hour later at the police station. The Supreme Court has not provided guidance on the circumstances in which a suspect may invoke his *Miranda* right to counsel prior to authorities' first question, or how far in advance such rights may be effectively invoked. We cannot say, therefore, that "it is so obvious that a clearly established rule applies" to the present set of facts that "there c[an] be no 'fairminded disagreement' on the question" whether Williams's *Miranda* right to counsel had attached at the time of his arrest. *White*, 134 S. Ct. at 1706–07 (quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011)). For these reasons, Williams would not be entitled to habeas relief even if we agreed with his contention that the Ohio Supreme Court erred in interpreting the statements he made during his arrest.

3. The *Miranda* Waiver and Williams's Question About Penamon at the Beginning of His Interrogation

Williams also argues that he asserted his *Miranda* right to counsel at the beginning of his interrogation, and that his *Miranda* waiver is invalid because his interrogators misled him into signing it. Both issues arise out of Williams's interactions with Detectives Beavers and Mauro during the first few minutes of his interrogation, so we address them together.

a. Facts

Before asking Williams any questions about McDowell's murder, Detective Beavers presented Williams with a *Miranda* waiver form and confirmed that Williams could read and

write and was not under the influence of alcohol. Detective Beavers then read the form to Williams and asked Williams if he understood each provision, and Williams said he did. During the review of the waiver form, Detective Beavers emphasized that Williams's rights "stay[ed] with [him] and [could] be claimed . . . at any time during the questioning." (Video, State's Trial Ex. 92 at 8:48 a.m.) When Detective Beavers started to explain what that meant, Williams cut him off and stated: "At any time I can stop." (*Id.*) Detective Beavers agreed, and further explained: "at any time you can request an attorney." (*Id.*) Detective Beavers then told Williams: "If at any time you say, 'hey, I'm done talking,' you can stop it at any time." (*Id.*) Then, as the review of the waiver form continued, Williams told the detectives: "I'm gonna talk to you." (*Id.* at 8:49 a.m.) Detective Beavers then asked Williams again whether he understood his rights, and that he could claim them at any time. Williams said that he did.

Detective Beavers next asked Williams to confirm he had not been pressured to make a statement. Williams responded: "I was coming on my own, though . . . I was coming. He was gonna bring me down here at ten o'clock, we had already discussed it. And that's what I kept telling them . . . ." (*Id.* at 8:50 a.m.) Williams recounted some of the circumstances of his flight from police and his subsequent arrest, and said that he had been "going to get [his] lawyer." (*Id.* at 8:51 a.m.) Williams went on to say "I don't want this"—without specifying what he did not want. (*Id.*) The detective then stated again that Williams could invoke his rights at any time, and asked Williams: "You want to sign here and make a statement?" (*Id.*) Without further prompting, Williams reached for a pen and signed. Below a standard recitation of the *Miranda* rights, the waiver form states:

> I have read the statement of my rights shown above. I understand what my rights are. I am willing to answer questions and make a statement. I do not want a lawyer at this time. I understand and know what I am doing. No promises

or threats have been made to me and no pressure of any kind has been used against me.

(Waiver of Rights Form, R. 16, Vol. 21 at 14.)

Williams then asked: "Why did they run my lawyer away?" (Video, State's Trial Ex. 92 at 8:52 a.m.) Detective Mauro responded: "Run him away? We told him that if he needed to talk to you or whatever we're gonna bring you here." (*Id.*) Detective Mauro also told Williams that the man whose house Williams had been trying to enter had not been happy, and Williams answered that he had had the wrong house. Detective Beavers told Williams that was not the issue they wanted to talk about, and then asked Williams to "start at the beginning." (*Id.*) Williams responded: "I'm fitting to tell you," and started to describe his activities on the day of McDowell's death without further prompting. (*Id.*)

### b. Discussion

Reviewing this evidence, the Ohio Supreme Court concluded that

Williams did not ask to consult either Penamon or any other attorney before or after he voluntarily signed the waiver of his rights. Moreover, Williams never asked to see Penamon even though Williams knew that Penamon had observed the police arrest him . . . Williams's brief complaint about the police chasing away Penamon when Williams was arrested did not constitute a request to consult with Penamon.

*Williams II*, 793 N.E.2d at 458. The court therefore found that Williams did not invoke his right to counsel and that his waiver was valid. *Id.*

Williams disagrees, and argues that he "unambiguously demonstrated his desire to have his counsel present" because his statement "I don't want this" must be understood as "referring to any interrogation without the presence of counsel." (Reply Br. at 15, 17.) The question, then, is whether "a reasonable police officer" would understand Williams's statement ("I don't want this") "to be a request for an attorney," *Davis*, 512 U.S. at 459, given the "totality of the

circumstances surrounding the interrogation," *Moran*, 475 U.S. at 421 (citation omitted). As Detective Beavers read the waiver form aloud, Williams agreed that he understood each of his rights, including that: "you have the right to the presence of a lawyer during the questioning," and "unless you are willing to give up the above rights, no statement of yours can be accepted and no questions will be asked of you." (Video, State's Trial Ex. 92 at 8:47 a.m.; Waiver of Rights Form, R. 16, Vol. 21 at 14.) And in the course of discussing his rights, Williams himself said: "At any time I can stop," and "I'm gonna talk to you." (Video, State's Trial Ex. 92 at 8:48-8:49 a.m.) Further, when Williams mentioned that he had been trying to reach his attorney before he was arrested and said "I don't want this," Detective Beavers reminded Williams he could invoke his rights at any time, and asked Williams if he wanted to sign the waiver form and make a statement. (*Id.* at 8:51 a.m.) Williams did not respond by asking for Penamon or another attorney; rather, he signed the waiver form without comment or hesitation.

Even coming just after Williams's statement that he had been trying to get to his attorney when he was arrested, the most that can be said about Williams's statement "I don't want this" is that it was "an ambiguous or equivocal statement" that *might* have been intended to mean "I don't want this questioning to continue without my attorney being present." Faced with an ambiguous statement, officers are not required to ask clarifying questions. *Davis*, 512 U.S. at 461. In this case, though, Detective Beavers followed up by asking: "You want to sign here and make a statement?" (Video, State's Trial Ex. 92 at 8:51 a.m.) Williams's response was to sign the waiver form without further question or complaint. Given this sequence of events, we cannot say it was an unreasonable application of Supreme Court precedent to decide that Williams did not unambiguously invoke his right to counsel.

Williams further argues that his *Miranda* waiver is invalid because the detectives deceived him about Penamon's availability. This argument is all but foreclosed by *Moran*. In that case, a detainee's sister arranged to have a lawyer represent him. *Moran*, 475 U.S. at 415–17. The lawyer contacted police, and a detective arguably misled the lawyer about whether and when the detainee would be questioned. *Id.* at 417–18. Police also declined to tell the detainee that his sister had arranged a lawyer for him, and that the lawyer was seeking to assist him. *Id.* The detainee never asked for an attorney and signed several *Miranda* waivers. *Id.* He then made incriminating statements, and was eventually convicted of murder. *Id.* at 418. The Supreme Court found no *Miranda* violation, explaining that "[e]vents occurring outside of the presence of the suspect and entirely unknown to him surely can have no bearing on the capacity to comprehend and knowingly relinquish a constitutional right." *Id.* at 422. The Court also explained that police are not required to "supply a suspect with a flow of information to help him calibrate his self-interest in deciding whether to speak or stand by his rights." *Id.*

Williams's counsel tried admirably to distinguish this case from *Moran* at oral argument, but the facts are simply too close. True, unlike the detainee in *Moran*, Williams was expecting an attorney. But, as in *Moran*, whatever police did or did not tell Penamon when he arrived at the station, those interactions happened "outside of the presence of" Williams and were "entirely unknown to him," and so "can have no bearing" on the validity of his *Miranda* waiver. *Id.* at 422.[7] The detectives made only one reference to Penamon in Williams's presence during the relevant time period. Williams asked: "Why did they run my lawyer away?", and Detective

---

[7] Thus, even if we could consider Penamon's postconviction affidavit, with its insinuation that police officers gave Penamon inaccurate or misleading information about Williams's location, it would not matter. *Moran*, 475 U.S. at 422–23 ("Although highly inappropriate, even deliberate deception of an attorney could not possibly affect a suspect's decision to waive his *Miranda* rights unless he were at least aware of the incident.").

Mauro responded: "We told him that if he needed to talk to you or whatever we're gonna bring you here." (Video, State's Trial Ex. 92 at 8:52 a.m.) We find nothing in the record to suggest that statement or anything else Detectives Beavers and Mauro said to Williams was untrue or misleading. And while police did not tell Williams that Penamon had arrived at the station, "Williams never asked to see Penamon even though Williams knew that Penamon had observed the police arrest him." *Williams II*, 793 N.E.2d at 445. Nor did Williams "ask to consult . . . any other attorney"—despite being told that one could be appointed for him—"before or after he voluntarily signed the waiver of his rights." *Id.* Given the "totality of the circumstances," *Garner*, 557 F.3d at 260–61, reasonable jurists could conclude that Williams's *Miranda* waiver was valid. Thus, there was no unreasonable application of federal law.

## C. *Strickland* Claims

Lastly, Williams claims that his attorneys were constitutionally ineffective during the mitigation phase of his trial because they failed to secure a sex-offender expert, failed to present evidence of the repeated sexual abuse Williams suffered as a child, failed to review Williams's prison records, and employed Dr. Layne, whose testimony allegedly damaged Williams's case. The Ohio courts found no merit to those claims, and we conclude that habeas relief is not justified.

## 1. Applicable Law

To establish ineffectiveness, Williams must show that 1) counsel's performance was deficient—objectively unreasonable under prevailing professional norms—and 2) it prejudiced the defense. *Strickland*, 466 U.S. at 687–88. As to counsel's performance, we must be "highly deferential" and refrain from second-guessing. *Id.* at 689. Further, because § 2254(d) applies, we do not ask "whether counsel's actions were reasonable." *Richter*, 562 U.S. at 105.

Instead, out of deference to the state courts, we ask only if "there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.*

Prejudice is established by showing there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different. *Strickland*, 466 U.S. at 694. Although the reasonable-probability standard is lower than the more-probable-than-not standard, *Kyles v. Whitley*, 514 U.S. 419, 434 (1995); *Strickland*, 466 U.S. at 693–94, the difference between the two "is slight and matters 'only in the rarest case.' The likelihood of a different result must be substantial, not just conceivable." *Richter*, 562 U.S. at 112 (quoting *Strickland*, 466 U.S. at 697).

On habeas review, we look to "the last reasoned state court decision." *Cauthern*, 736 F.3d at 473 (citing *Pinholster*, 563 U.S. at 187–88). "The last reasoned state court decision may be different with respect to certain claims" when some are presented "during [a] collateral challenge" and others "were only raised during [the petitioner]'s direct appeals." *Id.* at 474 n.7. As to defense counsel's use of Dr. Layne as an expert, the last reasoned state court decision is the Ohio Supreme Court's 2003 ruling on direct appeal. *See Williams II*, 793 N.E.2d at 467–68. As to Williams's other ineffective assistance of counsel claims, the last reasoned state court decision is the Court of Appeals of Ohio's 2002 decision during postconviction proceedings. *See Williams I*, 777 N.E.2d at 896–97.

### 2. Direct Appeal Claim – Use of Dr. Layne

Williams argues that his attorneys were ineffective in presenting psychologist Dr. Christopher Layne as an expert witness because Dr. Layne was unqualified and Dr. Layne's testimony was actually damaging to Williams's case.

First, Dr. Layne was licensed, board certified in psychology and forensic neuropsychology, had multiple degrees, had taught and practiced extensively, and had published over 50 articles and two books. Despite this, Williams argues that Dr. Layne was unqualified because of one exchange with the prosecutor during cross-examination:

> Q:   Is there a drug that you can give [Williams] that is going to make him normal?
>
> A:   There is no drug that I know of. It's a little more beyond my expertise, but I know of no drug for criminals. Some sex offenders have gotten Dep[o] Provera to neutralize their urges. But again, it's beyond my expertise.

(Mitigation Hr'g Tr., R. 18, Vol. 10 at 111–12.) Williams reads this testimony as an admission by Dr. Layne that he was not qualified to opine regarding the psychology of sex offenders. We think the better reading of this testimony is that Dr. Layne was acknowledging he was not an expert in the *pharmacological* aspects of treating sex offenders—an unremarkable admission, since psychologists are not medical doctors. There is no dispute that Dr. Layne was qualified to offer the opinions defense counsel asked him to offer.

Second, Williams is correct that some of Dr. Layne's testimony may have been harmful, such as when Dr. Layne referred to Williams as "a hardened gutless criminal" and "basically a bad person." (Mitigation Hr'g Tr., R. 18, Vol. 10, at 84, 100.) But Dr. Layne also provided potentially helpful testimony about "Williams's dysfunctional family, his irresponsible parents, the abuse heaped upon him as a child, his chaotic upbringing, and his mental and emotional problems." *Williams II*, 793 N.E.2d at 468. In particular, Dr. Layne's testimony and his accompanying report (also introduced into evidence) made clear Williams had been in and out of the juvenile justice and social services systems from an early age, but never received the intensive and ongoing treatment recommended by mental health professionals. For example, when Williams was 13, a psychiatrist concluded that Williams needed to be placed in a "highly

structured setting" with "long term intensive care," but noted that "no places are available at present." (Layne Report, R. 45-1, PID 645.) And Dr. Layne found no evidence Williams was placed in an appropriate facility at that time. Then, when Williams was 17, a psychologist concluded Williams was subject to "neurotic breakdown[s]" and his score on one test was "similar to hospitalized psychiatric patients." (*Id.* at 635.) The psychologist further concluded Williams had not "developed socially acceptable ways of resolving his anger," "tend[ed] to hold it in until it bursts out in violence," and that Williams needed "long-term psychotherapy." (*Id.*) But budget issues delayed Williams's placement in a treatment facility, and there was no evidence Williams ever received the recommended therapy. Summing up the consequences of the many failures by Williams's parents and the social services system, Dr. Layne testified that "if Williams had received proper discipline, counseling, and psychiatric treatment as he was growing up," the probability he would have committed the crimes at issue would have been low. *Williams II*, 793 N.E.2d at 468. Finally, Dr. Layne "described Williams's problems with alcohol and chronic depression, and noted that Williams would be less dangerous as he grew older in prison." *Id.*

The Ohio Supreme Court concluded that: "In its entirety, Dr. Layne's testimony represented potentially credible mitigation evidence that counsel could reasonably present to the jury. Dr. Layne's testimony explained, in depth, Williams's history and background, and helped place Dr. Layne's negative comments about Williams's character into a broader context." *Id.* Williams's attacks on this conclusion all rely on evidence submitted in his postconviction proceedings, which we may not consider when evaluating the Ohio Supreme Court's decision on direct appeal. *Pinholster*, 563 U.S. at 180–81. The record that was in front of the Ohio Supreme Court reflects that Williams's attorneys chose a plausible mitigation strategy based on the

analysis of a qualified expert. *Strickland*, 466 U.S. at 689 ("There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way."); *Lewis v. Alexander*, 11 F.3d 1349, 1353 (6th Cir. 1993) ("An attorney is entitled to rely on a professional of established skill and reputation in formulating judgments necessary to trial preparation.").

Third, the upshot of Williams's arguments is that Dr. Layne should not have been called at all. But we see no "reasonable probability" that, but for counsel's alleged error in calling Dr. Layne as a witness, "the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. Williams might have gained from omitting Dr. Layne's harsh description of him. But Williams would have lost the benefit of having a disinterested expert—as opposed to only his own relatives—talk about the effects of his terrible upbringing. Williams also would have lost the benefit of Dr. Layne's expert opinion that, had Williams received the care and treatment he needed as an adolescent, he probably would not have raped and murdered Velma McDowell.

For those reasons, it was not unreasonable for the Ohio Supreme Court to conclude that Williams had failed to demonstrate either deficient performance or prejudice.

### 3. Lack of a Sex-Offender Expert and Prison Records

In postconviction proceedings, Williams submitted the affidavits of psychologist Dr. Allen J. Brown and mitigation specialist Dorian L. Hall. *See* discussion *supra* Section II.C.2. Williams also submitted additional prison records, which, according to Dr. Brown, show that Williams would have adjusted well to prison life and would not have been a danger to others. Williams relies on these documents to argue that his attorneys' performance was deficient because they failed to employ a sex-offender expert—like Dr. Brown. He also argues that

defense counsel should have presented evidence of the sexual abuse he suffered as a child, not just the beatings and other physical abuse.

The Ohio Court of Appeals denied relief on the grounds that Williams had not established deficient performance, without reaching the question of prejudice. *Williams I*, 777 N.E.2d at 896–97. In the state court's view, Williams sought to present "an alternative theory of mitigation that explains appellant's deviant sexual behavior." *Id.* at 897. The court reasoned that *Strickland* deference prevented such second-guessing. *Id.*; *see Strickland*, 466 U.S. at 689. For the most part, we agree. It was not unreasonable to conclude that defense counsel's mitigation strategy fell "within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689; *see* discussion *supra* Section III.C.2. However, a trial strategy chosen "after less than complete investigation [is] reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Strickland*, 466 U.S. at 690–91. And the additional evidence offered in postconviction proceedings raises the question whether counsel's investigation was adequate. Thus, we consider whether counsel was ineffective for failing to investigate further.

Williams's arguments on this point have some appeal. Given the nature of the case and the advice defense counsel received from Hall, the mitigation expert, we might expect counsel to have secured all the defendant's prison records and employed a psychologist with a specific expertise in sex offenders. The problem with this argument is that it ignores Williams's own role in impeding his attorneys' efforts to develop his mitigation case. *See* discussion *supra* Section II.A.

"In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to

counsel's judgments." *Strickland*, 466 U.S. at 690. In *Schriro v. Landrigan*, the Supreme Court noted that it had never addressed a situation where a defendant "interferes with counsel's efforts to present mitigating evidence." 550 U.S. 465, 478 (2007). In *Landrigan*, the defendant "interrupted repeatedly when counsel tried to proffer anything that could have been considered mitigating." *Id.* at 476. Applying AEDPA deference, the Court concluded that "it was not objectively unreasonable" for the state court "to conclude that a defendant who refused to allow the presentation of any mitigating evidence could not establish *Strickland* prejudice based on his counsel's failure to investigate further possible mitigating evidence." *Id.* at 478.

This case, though not identical, is conceptually similar. Here, prosecutors disclosed records that revealed Williams's complicated history of mental health problems and juvenile sex offenses. Shortly thereafter, Williams's attorneys contacted the Office of the Ohio Public Defender for mitigation help. Indeed, Williams's attorneys were trying to identify a sex-offender expert—in his postconviction affidavit, Dr. Layne stated that defense counsel asked for his help in identifying a sex-offender expert, but he was unable to suggest one. Meanwhile, Williams's attorneys repeatedly told him throughout July 1999 that they needed more time to fully develop his mitigation case. But Williams rejected that advice and insisted on going to trial on August 9.[8] Williams did not "refuse[] to allow the presentation of *any* mitigating evidence," but his insistence on going to trial on August 9 did "interfere[] with counsel's efforts" to develop and "present mitigating evidence." *Landrigan*, 550 U.S. at 478 (emphasis added).

---

[8] Williams argued to the district court that counsel should nevertheless have insisted on a continuance, or that the state trial court should have delayed the trial despite Williams's express wishes. But Williams has abandoned those arguments on appeal, so we are not called upon to give our view on what counsel or the state trial court should have done.

Williams's choice left his attorneys with less than three weeks to finish preparing for trial. It was Williams's burden to present evidence that his attorneys' performance was unreasonable. *Richter*, 562 U.S. at 104. But Williams did not present any evidence to the state court that sheds light on why counsel did not pursue these leads sooner. Nor did he present any evidence as to how counsel used the very limited time available to them once the trial date was fixed. Under the circumstances, counsel might well have made a reasonable decision to focus on other areas of trial preparation. Or counsel may have been working diligently to identify all of the evidence later found in Dr. Brown's report and Williams's prison records. In the absence of any evidence on that point, we can only speculate. And speculation alone is insufficient for Williams to meet his burden and clear the doubly high hurdle set by *Strickland* and § 2254(d)(1).

For those reasons, we cannot say that the state court unreasonably determined that Williams had not demonstrated that his counsel's performance was deficient.[9]

## IV.

For these reasons, we **AFFIRM**.

---

[9] Thus, we need not address Respondent's argument that Williams cannot demonstrate *Strickland* prejudice.